PETER LUURTSEMA *v.* COMMISSIONER OF
CORRECTION
(SC 18383)

Rogers, C. J., and Katz, Palmer, McLachlan, Eveleigh and Vertefeuille, Js.

Argued September 21, 2010—officially released January 5, 2011*

---

* January 5, 2011, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Adele V. Patterson*, senior assistant public defender, with whom was *Jennifer L. Bourn*, assistant public defender, for the appellant (petitioner).

*Jo Anne Sulik*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Dennis J. O'Connor*, senior assistant state's attorney, for the appellee (respondent).

*Jamie L. Mills, Sarah LeClair, Susanna Cowen* and *Margaret Garvin* filed a brief for the National Crime Victim Law Institute et al. as amici curiae.

*Opinion*

ROGERS, C. J. The primary issue in this matter is whether this court's decisions in *State* v. *Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008), and *State* v. *Sanseverino*, 287 Conn. 608, 949 A.2d 1156 (2008), overruled in part by *State* v. *DeJesus*, 288 Conn. 418, 437, 953 A.2d 45, superseded in part after reconsideration by *State* v. *Sanseverino*, 291 Conn. 574, 969 A.2d 710 (2009),[1] apply retroactively to collateral attacks on final judgments. In those cases, we concluded that General Statutes § 53a-92 (a) (2) (A)[2] does not impose liability for the

[1] Unless otherwise indicated, references to *Sanseverino* in this opinion are to *State* v. *Sanseverino*, supra, 287 Conn. 608.

[2] General Statutes § 53a-92 (a) provides: "A person is guilty of kidnapping in the first degree when he abducts another person and: (1) His intent is to compel a third person (A) to pay or deliver money or property as ransom or (B) to engage in other particular conduct or to refrain from engaging in particular conduct; or (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually; or (B) accomplish or advance the commission of a felony; or (C) terrorize him or a third person; or (D) interfere with the performance of a government function."

crime of kidnapping where the restraint used is merely incidental to the commission of another offense. The petitioner, Peter Luurtsema, subsequently filed a petition for a writ of habeas corpus in the Superior Court, challenging, inter alia, the legality of his 2000 conviction under a prior interpretation of § 53a-92 (a) (2) (A). On the joint stipulation of the petitioner and the respondent, the commissioner of correction (state), the habeas court reserved[3] the questions: (1) whether *Salamon* and *Sanseverino* apply retroactively in habeas corpus proceedings; and (2) whether those cases apply in the petitioner's case in particular. We answer both questions in the affirmative.[4]

The following relevant facts and procedural history are set forth in our decision on the petitioner's direct appeal from his conviction. See *State* v. *Luurtsema*, 262 Conn. 179, 811 A.2d 223 (2002). On February 17, 2000, the petitioner was convicted, after a jury trial, of attempted sexual assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-70 (a) (1), kidnapping in the first degree in violation of § 53a-92 (a) (2) (A), assault in the second degree in violation of General Statutes § 53a-60 (a) (1), and, following a plea of nolo contendere, of being a persistent dangerous felony offender under General Statutes (Rev. to 1997) § 53a-40 (a). Id., 181–82. The trial court imposed a total effective sentence of forty-five years imprisonment, comprising concurrent prison terms of twenty years for attempted sexual assault in the first degree and forty years for kidnapping in the first degree as a persistent dangerous felony offender, with a consecutive prison

---

[3] The court reserved the questions for the advice of the Appellate Court pursuant to Practice Book § 73-1, and we transferred the reservation to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[4] Due to the importance of the issue raised by this appeal, we granted the requests of the National Crime Victim Law Institute and Connecticut Sexual Assault Crisis Services, Inc., to appear as amicus curiae and to submit briefs in support of the position advocated by the state.

term of five years for assault in the second degree. The enhanced kidnapping sentence thus increased the petitioner's effective sentence from twenty-five to forty-five years.[5] Id., 182 and n.7.

On direct appeal to this court, the petitioner argued, inter alia, that the evidence presented at trial was insufficient to convict him of kidnapping. We noted that the jury reasonably could have found the following facts: "On the evening of April 21, 1998, the [petitioner] visited the victim at her apartment in Manchester. During the course of the night, the [petitioner] and the victim consumed several beers and smoked crack cocaine. At some point prior to midnight, the victim consented to oral sex from the [petitioner]. At approximately 1 a.m., Larry Brown, a neighbor, visited the victim in her apartment while the [petitioner] was still there. Outside the presence of the victim, the [petitioner] asked Brown to leave because he wanted to be alone with the victim. Brown complied with the [petitioner's] request. At the time Brown left, he did not observe any marks on the victim's face.

"Shortly after Brown's departure, the [petitioner] and the victim were seated next to each other on the couch. The [petitioner] proceeded to pull the victim to the floor and remove her pants and underpants. While they were

[5] Without the enhanced kidnapping charge, the petitioner would have been subject to a maximum sentence of twenty years for attempted sexual assault in the first degree, a class B felony; see General Statutes §§ 53a-49 (a) (2), 53a-70 (a) (1) and 53a-35a (6); and five additional years for assault in the second degree, a class D felony. See General Statutes §§ 53a-60 (a) (1) and 53a-35a (8). We note, however, that in addition to that twenty-five year sentence, had the petitioner not been convicted of kidnapping, he might have been subject to an additional sentence if the prosecution had sought and the jury had convicted him of the lesser included charge of unlawful restraint in the first degree, a class D felony that carried a five year maximum sentence; see General Statutes §§ 53a-95 and 53a-35a (8); or unlawful restraint in the second degree, a class A misdemeanor that carried a one year maximum sentence. See General Statutes §§ 53a-96 and 53a-36 (1).

on the floor, the [petitioner] forced the victim's legs apart in an extremely harsh manner and began manually choking her to the point where she could no longer breathe. The [petitioner] then got up and moved toward the bathroom, at which time the victim ran screaming from her apartment, naked from the waist down, to a convenience store across the street where the police were summoned." Id., 183–84.

The petitioner argued on direct appeal that these facts were insufficient to support the jury's verdict of guilty of kidnapping under § 53a-92 (a) (2) (A) because the movement of the victim—from couch to floor—fell short of what is required for " 'abduction.' "[6] Id., 200. He further argued that, as a matter of law, the statute does not create additional criminal liability where restraint of a victim is merely incidental to a sexual assault. In rejecting this claim, we reiterated our long-standing interpretation that "all that is required under the [kidnapping] statute is that the defendant have abducted the victim and restrained her with the requisite intent. See *State* v. *Niemeyer*, [258 Conn. 510, 520, 782 A.2d 658 (2001)]. Under the aforementioned definitions, the abduction requirement is satisfied when the defendant restrains the victim with the intent to prevent her liberation through the use of physical force. . . . Nowhere in this language is there a requirement of movement on the part of the victim. Rather, we read the language of the statute as allowing the restriction of movement alone to serve as the basis for kidnapping. . . .

"[O]ur legislature has not seen fit to merge the offense of kidnapping with other felonies, nor impose any time

---

[6] " 'Abduct' means to restrain a person with intent to prevent his liberation by either (A) secreting or holding him in a place where he is not likely to be found, or (B) using or threatening to use physical force or intimidation." General Statutes § 53a-91 (2). Abduction is an element of kidnapping. See footnote 2 of this opinion.

requirements for restraint, nor distance requirements for asportation, to the crime of kidnapping. . . . Furthermore, any argument that attempts to reject the propriety of a kidnapping charge on the basis of the fact that the underlying conduct was integral or incidental to the crime of sexual assault also must fail. *State* v. *Vass*, 191 Conn. 604, 614, 469 A.2d 767 (1983). The defendant's interpretation of the kidnapping statute is simply not the law in this state." (Citations omitted; internal quotation marks omitted.) *State* v. *Luurtsema*, supra, 262 Conn. 201–202.

Six years later, however, in *State* v. *Salamon*, supra, 287 Conn. 513, we had cause to revisit our interpretation of the kidnapping statutes, General Statutes § 53a-91 et seq. Although we acknowledged that our interpretation of the kidnapping statutes in *Luurtsema* traced its origins as far back as *State* v. *Chetcuti*, 173 Conn. 165, 377 A.2d 263 (1977),[7] we nonetheless recognized that "this court never has undertaken an extensive analysis of whether our kidnapping statutes warrant the broad construction that we have given them." *State* v. *Salamon*, supra, 524.

Examining the legislative history and general historical backdrop of the statute more closely than we had in the past, we concluded that "our construction of this state's kidnapping statutes has been overly broad, thereby resulting in kidnapping convictions for conduct that the legislature did not contemplate would provide the basis for such convictions." Id., 517. Specifically, we held that "to commit a kidnapping in conjunction with another crime, a defendant must intend to prevent

---

[7] We did recognize in previous cases, however, that "there are conceivable factual situations in which charging a defendant with kidnapping based [on] the most minuscule [movement or duration of confinement] would result in an absurd and unconscionable result . . . ." (Internal quotation marks omitted.) *State* v. *Luurtsema*, supra, 262 Conn. 203–204; see also *State* v. *Jones*, 215 Conn. 173, 180, 575 A.2d 216 (1990).

the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit the other crime." Id., 542. *Salamon* thus expressly overruled *Luurtsema*, noting that, in "*Luurtsema*, we rejected a claim identical in all material respects to the claim that the defendant [raised in *Salamon*] . . . ." Id., 513 n.6. Additionally, we observed in *Salamon* that the prior interpretation of the kidnapping statutes had permitted—if not outright encouraged—prosecutors "to include a kidnapping charge in any case involving a sexual assault or robbery," contrary to the likely intent of the legislature. Id., 544.

In *State* v. *Sanseverino*, supra, 287 Conn. 608, a companion case released on the same day as *Salamon*, we took up a second challenge by a defendant convicted under § 53a-92 (a) (2) (A), this time for conduct incidental to a series of sexual assaults. The defendant in *Sanseverino* attacked his conviction on constitutional grounds, arguing that § 53a-92 (a) (2) (A) was unconstitutionally vague as applied to his conduct. Id., 618. Avoiding that constitutional question; id., 620; this court instead applied retroactively the rule announced in *Salamon*,[8] holding that the state had not presented sufficient evidence at trial to convict the defendant of kidnapping, properly construed. Id., 624–26.

Following the release of *Salamon* and *Sanseverino*, the petitioner in the present case, proceeding pro se, filed a petition for a writ of habeas corpus, asking that his kidnapping conviction and the concomitant persistent felony offender enhancement be vacated. He contended that he should receive the benefit of this court's new interpretation of the kidnapping statutes, and that,

---

[8] Because the direct appeal in *Sanseverino* was still pending when *Salamon* was decided, there was no question that the *Salamon* rule applied retroactively in that case. See *State* v. *Sanseverino*, supra, 287 Conn. 620 n.11 (noting well established principle that "a rule enunciated in a case presumptively applies retroactively to pending cases").

under that interpretation: (1) § 53a-92 (a) (2) (A) was unconstitutionally vague as applied in his case; and (2) the trial court had improperly denied his request to instruct the jury that he could not be convicted of kidnapping if the jury found that the restraint used was merely incidental to the underlying assault.

The habeas court, pursuant to General Statutes § 52-470 (a), scheduled a hearing "at which time the [state] must show cause why the petition for a writ of habeas corpus should not be granted, the petitioner's conviction for kidnapping in the first degree be vacated, and the matter restored to the criminal docket for further proceedings consistent with [*Salamon* and *Sanseverino*]." In response, the state argued that full retroactive application of those opinions[9] is barred by principles of res judicata and the law of the case.

Pursuant to the joint stipulation of the parties, the habeas court ordered the reservation of two questions: "(1) Do the cases of [*Salamon* and *Sanseverino*] apply in habeas corpus proceedings?" and "(2) Do the cases of [*Salamon* and *Sanseverino*] apply in [the petitioner's] habeas corpus case?" The parties agree that the answers to these questions will assist the habeas court in reaching a prompt determination of the lawfulness of the petitioner's confinement. We answer the reserved questions in the affirmative.

I

Whether individuals whose kidnapping convictions became final prior to our reconsideration of § 53a-92 (a) (2) (A) in *Salamon* may challenge the legality of their convictions based on the interpretation that we adopted in that case is a question of first impression

---

[9] Throughout this opinion, the terms "full retroactivity" and "fully retroactive" refer to the retroactive application of a judicial opinion to cases that have already become final, as distinguished from the retroactive application of a decision to cases still pending on direct appeal.

for this court. The petitioner contends that inmates should be permitted to challenge their convictions in a habeas proceeding under either of two theories. First, the petitioner contends that the interpretation of § 53a-92 (a) (2) (A) in *Salamon* may be construed as a mere clarification of what the kidnapping statute always has meant. In that case, he argues that his conviction violated the due process clause of the federal constitution,[10] as interpreted in *Fiore* v. *White*, 531 U.S. 225, 121 S. Ct. 712, 148 L. Ed. 2d 629 (2001),[11] and its progeny,

[10] The due process clause of the fourteenth amendment to the United States constitution provides in relevant part: "[N]or shall any State deprive any person of life, liberty or property, without due process of law . . . ."

[11] *Fiore* addressed the constitutionality of a conviction for violating a state statute prohibiting the operation of a waste facility without a permit. *Fiore* v. *White*, supra, 531 U.S. 226. Although the defendant, William Fiore, did in fact possess a permit, the prosecution secured a conviction by arguing that his activities exceeded the scope of the permit. Id., 227. After Fiore's conviction became final, the Pennsylvania Supreme Court, in *Commonwealth* v. *Scarpone*, 535 Pa. 273, 279, 634 A.2d 1109 (1993), reviewed the conviction of Fiore's codefendant and, analyzing the applicable statute for the first time, held that it did not criminalize deviation from a permit. Based on that decision, Fiore collaterally challenged his conviction. See *Fiore* v. *White*, 528 U.S. 23, 24, 120 S. Ct. 469, 145 L. Ed. 2d 353 (1999). To resolve the case, the United States Supreme Court certified to the Pennsylvania Supreme Court the question of whether *Scarpone*, in which the court had interpreted the applicable statute for the first time, represented a new interpretation of the law or was rather "the correct interpretation of the law of Pennsylvania at the date Fiore's conviction became final." Id., 29; *Fiore* v. *White*, supra, 531 U.S. 228. The Pennsylvania Supreme Court replied that its ruling merely furnished a proper statement, or clarification, of the law at the time that Fiore was convicted. *Fiore* v. *White*, supra, 531 U.S. 228. Based on that answer, the United States Supreme Court held that Fiore's conviction violated federal due process requirements because he had been convicted of a crime without proof beyond a reasonable doubt of each element of that crime. Id., 228–29.

Thus, under *Fiore*, the retroactivity analysis hinges on whether, when a state's highest court issues a new interpretation of a substantive criminal statute, that new interpretation is a change in or a clarification of the law. Id., 228. If a state court deems its new interpretation to be a change, then the application of the statute to persons who were convicted prior to the adoption of the new rule would be decided as a matter of state retroactivity common law. Id., 226. By contrast, if the court deems the new interpretation to be a mere clarification of what the law always has meant, then there is

because he was convicted under an incorrect interpretation of the law. Alternately, the petitioner contends that if *Salamon* is construed more properly as having *changed* Connecticut's kidnapping law, this court has the discretion to apply the new interpretation retroactively in habeas corpus proceedings, and, under the circumstances of the present case, this court should do so. If we do opt to resolve the question as a matter of state retroactivity common law, the petitioner further urges us to adopt a per se rule that, when this court reinterprets a statute so as to narrow the potential scope of criminal liability, the new interpretation should be afforded fully retroactive effect. Alternately, if we decline to adopt a per se rule in his favor, the petitioner suggests that his case is an especially attractive candidate for retroactively applying *Salamon*.

The state, by contrast, argues that *Fiore* does not control the result here because *Salamon* cannot reasonably be read as a mere clarification of what the law on kidnapping has always been. The state thus concludes that we are not compelled to provide relief as a matter of federal due process. The state also contends that retroactive relief is not warranted under state common law. It calls upon this court to adopt a per se rule *against* full retroactivity and, alternately, posits that the petitioner's particular claim should fail under a balancing test.[12]

---

no issue of retroactivity per se. Id. Rather, the issue becomes whether the state has violated the petitioner's due process rights by convicting him under an incorrect interpretation of the law. Id., 228 ("the question is simply whether Pennsylvania can, consistently with the [f]ederal [d]ue [p]rocess [c]lause, convict Fiore for conduct that its criminal statute, as properly interpreted, does not prohibit").

[12] The state urges us to adopt the three factor test established in *Linkletter* v. *Walker*, 381 U.S. 618, 636, 85 S. Ct. 1731, 14 L. Ed. 2d 601 (1965), which considers the purpose of the new rule, the state's reliance on the old rule, and whether retroactive application of the new rule would adversely impact the administration of justice.

For the reasons that follow, we agree with the petitioner that, as a matter of state common law, *Salamon* should be afforded fully retroactive effect in his particular case. We therefore do not reach the constitutional due process challenge and need not resolve the thorny question of whether that opinion represented the sort of clarification of the law for which the federal constitution *requires* collateral relief under *Fiore*.[13] See *In re*

[13] To reach the petitioner's constitutional challenge, this court would first have to answer an almost metaphysical question: When this court overturns its own prior interpretation of a statute, are we changing the law of the state or are we clarifying what the law in fact always meant? As legal scholars have noted, "this issue relates to one of the most profound debates in the history of legal philosophy. It concerns the very nature of law and judging." T. O'Neill, " 'Making' or 'Discovering' Law Makes Big Difference," Chi. Daily L.B., July 11, 2003, p. 5.

Moreover, even assuming, for the sake of argument, that *Salamon* represented a clarification of what § 53a-92 (a) (2) (A) actually meant when the petitioner's conviction became final in 2003, it is unclear to what extent such a clarification—overruling a prior determination by this court—would implicate the due process concerns expressed in *Fiore*. At first blush, *Fiore* appears to stand for the broad principle that the due process clause bars conviction whenever a subsequent clarification of state law makes clear that the alleged behavior was not criminal when the conviction became final. See *Fiore* v. *White*, supra, 531 U.S. 228. The opinion itself stated the issue simply as "whether [a state] can, consistently with the [f]ederal [d]ue [p]rocess [c]lause, convict [a habeas petitioner] for conduct that its criminal statute, as properly interpreted, does not prohibit." Id.; see also *State* v. *Barnum*, 921 So. 2d 513, 519 (Fla. 2005) ("[*Fiore*] stands for the proposition that the due process guarantee requires the prosecution to prove each essential element of an offense beyond a reasonable doubt").

However, in both *Fiore* opinions—the opinion that certified the questions and the opinion that answered those questions—the court also emphasized the fact that *Commonwealth* v. *Scarpone*, 535 Pa. 273, 634 A.2d 1109 (1993), was a case of first impression for the Pennsylvania Supreme Court. See *Fiore* v. *White*, 528 U.S. 23, 28, 120 S. Ct. 469, 145 L. Ed. 2d 353 (1999) ("*Scarpone* marked the first time the Pennsylvania Supreme Court had interpreted the statute"); *Fiore* v. *White*, supra, 531 U.S. 226 ("[a]fter Fiore's conviction became final, the Pennsylvania Supreme Court interpreted the statute for the first time"). The United States Supreme Court likewise underscored the first impression aspect of *Fiore* in its subsequent opinion in *Bunkley* v. *Florida*, 538 U.S. 835, 839, 123 S. Ct. 2020, 155 L. Ed. 2d 1046 (2003), noting that *Fiore* "involved a Pennsylvania criminal statute that the Pennsylvania Supreme Court interpreted for the first time after . . . Fiore's conviction became final."

Some courts have thus taken *Fiore* to mean that the due process clause only compels retroactive application of a clarification of a substantive crimi-

*Shanaira C.*, 297 Conn. 737, 754, 1 A.3d 5 (2010) ("we must be mindful that [t]his court has a basic judicial duty to avoid deciding a constitutional issue if a nonconstitutional ground exists that will dispose of the case" [internal quotation marks omitted]); *State* v. *Winot*, 294

nal law where a state high court has not previously spoken to the issue. See, e.g., *Henry* v. *Ricks*, 578 F.3d 134, 138 (2d Cir. 2009) (*Fiore* provides for collateral relief "[w]here a state's highest court *for the first time* interprets a criminal statute to require proof of a particular element and that interpretation does not create new law but merely clarifies what the law was at the time of a defendant's conviction" [emphasis added; internal quotation marks omitted]); *Dixon* v. *Miller*, 293 F.3d 74, 79 (2d Cir. 2002) (same); *Chapman* v. *LeMaster*, 302 F.3d 1189, 1197–98 n.4 (10th Cir. 2002) (distinguishing *Fiore* as case of first impression); *Bunkley* v. *State*, 882 So. 2d 890, 919 (Fla. 2004) (Pariente, J., dissenting) ("*Fiore* applies only if two stringent conditions are met: [1] the pronouncement by this [c]ourt is a *first-time* clarification of a criminal statute and [2] the statute as properly interpreted does not prohibit the conduct for which the defendant has been convicted" [emphasis added]). On that view, *Fiore* would not compel relief in the present case, even if we determined that *Salamon* represented a clarification of the law, rather than a change.

Other courts, by contrast, have adopted the view taken by Justice Katz' concurrence that *Fiore* compels relief whenever a state court clarifies a criminal statute, even if that clarification represents a reversal of the state's prior jurisprudence. See, e.g., *Graves* v. *Ault*, 614 F.3d 501, 511–12 (8th Cir. 2010) ("*Fiore* relied exclusively on the state [S]upreme [C]ourt's determination of what conduct the criminal statute prohibited at the time of the conviction" and "key fact in *Fiore* was that the defendant was convicted of a crime without proof beyond a reasonable doubt as to each element of the crime"); *Warren* v. *Kyler*, 422 F.3d 132, 137 (3d Cir. 2005) (nothing in *Fiore* constrains state, as matter of state law, from determining whether state judicial decision represents clarification or change in law for due process purposes); *Bunkley* v. *State*, supra, 882 So. 2d 902 (Wells, J., concurring) ("[t]he essential principle from *Fiore* is that a determination of what the law is at the time of a defendant's conviction is decided on the basis of state law"); *Clem* v. *State*, 119 Nev. 615, 625–26, 81 P.3d 521 (2003) ("where a state's highest court departs from its own previous interpretation of a statute, the new decision may also constitute either a change or a clarification of the law even though the statutory language was not changed"); *In re Hinton*, 152 Wn. 2d 853, 860–61, 100 P.3d 801 (2004) (finding that intervening interpretation of state's felony murder statute constituted clarification and granting collateral relief under *Fiore*, even though new interpretation reversed more than three decades of court's precedents). Until the United States Supreme Court resolves this conflict, and consistent with our duty to avoid deciding a constitutional question if an alternative, nonconstitutional ground for decision is available, we believe the more prudent course is to decide this matter under state retroactivity common law.

Conn. 753, 782 n.2, 988 A.2d 188 (2010) (*Katz, J.*, dissenting) (same); accord *Thompson* v. *State*, 887 So. 2d 1260, 1262–64 (Fla. 2004) (reaching *Fiore* question only after first upholding District Court's conclusion that intervening decision, even if change in law, would not apply retroactively under state retroactivity jurisprudence); see also *Kleve* v. *Hill*, 243 F.3d 1149, 1151 (9th Cir. 2001) (declining to resolve whether intervening decision represented clarification of or change in law, because in either event habeas petitioner would not have been entitled to retroactive relief).

We begin our analysis with a review of the legal principles governing the retroactive application of judicial decisions in habeas proceedings. The threshold question is whether the rule of law under which the petitioner seeks relief is procedural or substantive in nature. See *Bousley* v. *United States*, 523 U.S. 614, 620, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998); see also *Schriro* v. *Summerlin*, 542 U.S. 348, 352–53, 124 S. Ct. 2519, 159 L. Ed. 2d 442 (2004). Here, the parties do not dispute that the court in *Salamon* made a substantive determination when it defined the elements of kidnapping under § 53a-92 (a) (2) (A).[14] See *Schriro* v. *Summerlin*,

[14] We agree with the petitioner that the rules governing the retroactive application of new procedural decisions, which derive from *Teague* v. *Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989), and its progeny, are inapposite here. See *Beard* v. *Banks*, 542 U.S. 406, 417 n.7, 124 S. Ct. 2504, 159 L. Ed. 2d 494 (2004); *Schriro* v. *Summerlin*, supra, 542 U.S. 352 n.4. Under *Teague*, new rules of criminal procedure do not apply retroactively to already final judgments in federal habeas proceedings unless they fall under one of several specified exceptions. *Teague* v. *Lane*, supra, 310. Although this court has in the past applied the *Teague* framework to state habeas proceedings as well; see, e.g., *Johnson* v. *Warden*, 218 Conn. 791, 797, 591 A.2d 407 (1991); the United States Supreme Court recently held in *Danforth* v. *Minnesota*, 552 U.S. 264, 282, 128 S. Ct. 1029, 169 L. Ed. 2d 859 (2008), that the restrictions *Teague* imposes on the fully retroactive application of new procedural rules are not binding on the states.

We also note that an entirely different legal framework governs the retroactive application of new statutes. See *Walsh* v. *Jodoin*, 283 Conn. 187, 195–96, 925 A.2d 1086 (2007) (new procedural statutes, unlike substantive ones, generally apply retroactively).

supra, 353 (distinguishing substantive criminal rules, which alter "the range of conduct or the class of persons that the law punishes," from procedural ones, which regulate "the manner of determining the defendant's culpability").

As a matter of federal constitutional law, each jurisdiction is free to decide whether, and under what circumstances, it will afford habeas petitioners the retroactive benefit of new judicial interpretations of the substantive criminal law issued after their convictions became final.[15] *Wainwright* v. *Stone*, 414 U.S. 21, 24, 94 S. Ct. 190, 38 L. Ed. 2d 179 (1973); *Great Northern Railway Co.* v. *Sunburst Oil & Refining Co.*, 287 U.S. 358, 364, 53 S. Ct. 145, 77 L. Ed. 360 (1932) ("the federal constitution has no voice upon the subject [of refusal to make new statutory interpretation retroactive]"); *Denardo* v. *Bergamo*, 272 Conn. 500, 509, 863 A.2d 686 (2005) (states are free to determine extent to which new decisions have retroactive effect).

Because this is a question of first impression in Connecticut, we begin by canvassing the approach to the issue taken by our sister states and the federal courts. See *Simmons* v. *Simmons*, 244 Conn. 158, 162, 164, 708 A.2d 949 (1998). It is clear that the majority of jurisdictions that have considered the question under the auspices of retroactivity common law, rather than as a question of federal due process, have opted to afford full retroactivity to new judicial interpretations of criminal statutes. We agree with the petitioner's assessment that, in the federal system, the United States Supreme Court has adopted a per se rule that, when federal courts reinterpret congressional legislation, new interpretations of substantive criminal statutes

---

[15] Throughout this opinion, we refer only to new statutory interpretations that *restrict* the potential scope of criminal liability. Different considerations govern the retroactive application of judicial decisions that expand the potential scope of a criminal statute.

must be applied retroactively on collateral review. *Schriro* v. *Summerlin*, supra, 542 U.S. 351–52.[16]

In addition, although cases of this ilk arise relatively infrequently, of the states that have confronted the issue, a majority follows the federal courts in adopting a per se rule in favor of full retroactivity. See, e.g., *State* v. *Towery*, 204 Ariz. 386, 389–90, 64 P.3d 828 (2003); *In re Moore*, 133 Cal. App. 4th 68, 74–75, 34 Cal. Rptr. 3d 605 (2005); *People* v. *Wenzinger*, 155 P.3d 415, 419 (Colo. App. 2006), cert. denied, 551 U.S. 1106, 127 S. Ct. 2919, 168 L. Ed. 2d 249 (2007); *Chao* v. *State*, 931 A.2d 1000, 1002 (Del. 2007); *Luke* v. *Battle*, 275 Ga. 370, 371–73, 565 S.E.2d 816 (2002); *People* v. *Edgeston*, 396 Ill. App. 3d 514, 519, 920 N.E.2d 467 (2009); *Jacobs* v. *State*, 835 N.E.2d 485, 488–91 (Ind. 2005); *State* v. *Whitehorn*, 309 Mont. 63, 72–74, 50 P.3d 121 (2002); *Commonwealth* v. *Spotz*, 587 Pa. 1, 88–90, 896 A.2d 1191 (2006); *Kelson* v. *Commonwealth*, 44 Va. App. 170, 176, 604 S.E.2d 98 (2004); *State* v. *White*, 182 Vt. 510, 516, 944 A.2d 203 (2007); *State* v. *Lagundoye*, 268 Wis. 2d 77, 88–92, 674 N.W.2d 526 (2004).

By contrast, we are not aware of any jurisdiction that has adopted the per se rule against full retroactivity

---

[16] The state posits that two of the cases that appear to establish a per se federal rule, *Bousley* v. *United States*, supra, 523 U.S. 620, and *United States* v. *Davis*, 417 U.S. 333, 341–42, 94 S. Ct. 2298, 41 L. Ed. 2d 109 (1974), predate *Fiore* and hence may not govern situations in which a court changes, rather than clarifies, its prior interpretation of a criminal statute. In *Schriro* v. *Summerlin*, supra, 542 U.S. 352, however, which was decided after *Fiore*, the United States Supreme Court cited both *Bousley* and *Davis* for the proposition that decisions that result in new substantive rules "generally apply retroactively. This includes decisions that narrow the scope of a criminal statute by interpreting its terms . . . . Such rules apply retroactively because they necessarily carry a significant risk that a defendant stands convicted of an act that the law does not make criminal or faces a punishment that the law cannot impose upon him." (Citations omitted; internal quotation marks omitted.) See also *United States* v. *Johnson*, 457 U.S. 537, 550, 102 S. Ct. 2579, 73 L. Ed. 2d 202 (1982) (court has "recognized full retroactivity as a necessary adjunct to a ruling that a trial court lacked authority to convict or punish a criminal defendant in the first place").

sought by the state.[17] At best, the state points to a handful of jurisdictions that employ some sort of balancing test to make a case-by-case determination of whether a particular habeas petitioner is entitled to benefit from a new interpretation of a criminal statute. See *Bunkley* v. *State*, 833 So. 2d 739, 743–44 (Fla. 2002); *Powell* v. *State*, 574 N.E.2d 331, 334 (Ind. App. 1991); *Clem* v. *State*, 119 Nev. 615, 626–28, 81 P.3d 521 (2003); *State* v. *J.A.*, 398 N.J. Super. 511, 519, 942 A.2d 149 (2008); *Santillanes* v. *State*, 115 N.M. 215, 223–24, 849 P.2d 358 (1993); *Policano* v. *Herbert*, 7 N.Y.3d 588, 603, 859 N.E.2d 484, 825 N.Y.S.2d 678 (2006). Since 2005, however, two of those states appear to have changed course and adopted the per se federal rule in favor of full retroactivity. First, we assume that *Powell* no longer remains good law in the face of the Indiana Supreme Court's 2005 decision in *Jacobs* v. *State*, supra, 835 N.E.2d 488–91. Second, in *Kersey* v. *Hatch*, 148 N.M. 381, 388–89, 237 P.3d 683 (2010), the New Mexico Supreme Court expressly disclaimed the *Linkletter* balancing test; see footnote 12 of this opinion; that it had employed in *Santillanes*, and, in citing *Schriro* v. *Summerlin*, supra, 542 U.S. 348, in dicta, also appeared to adopt the federal rule.[18] Moreover, as we discuss

---

[17] The state cites *Easterwood* v. *State*, 273 Kan. 361, 383, 44 P.3d 1209, cert. denied, 537 U.S. 951, 123 S. Ct. 416, 154 L. Ed. 2d 297 (2002), for such a rule. We read *Easterwood* differently. In that case, the court held only that a defendant who obtains a favorable plea agreement cannot later attack the resulting conviction based on a subsequent change in the law. Id.

The state also cites to *Goosman* v. *State*, 764 N.W.2d 539, 544 (Iowa 2009). In that case, the Iowa Supreme Court rejected the claim that due process concerns required the retroactive application of the court's prior decision in *State* v. *Heemstra*, 721 N.W.2d 549, 558 (Iowa 2006), which had decided, without analysis, that a new interpretation of the state's felony murder rule would only apply prospectively. Id., 540, 545. We do not read *Goosman* and *Heemstra* as expressing a per se rule against full retroactivity.

[18] Nevada also has appeared to waver in its approach to the retroactivity question. Compare *Nika* v. *State*, 124 Nev. 1272, 1301, 198 P.3d 839 (2008) (denying retroactive application to new interpretations of substantive criminal statutes), cert. denied, 558 U.S. 955, 130 S. Ct. 414, 175 L. Ed. 2d 284 (2009), with *Bejarano* v. *State*, 122 Nev. 1066, 1076, 146 P.3d 265 (2006)

subsequently in this opinion, although New York and New Jersey do purport to use a multifactor balancing test, in fact both states place a heavy finger on the scale in favor of retroactivity in cases such as this. Accordingly, we conclude that no state has adopted unequivocally a per se rule against retroactivity, and only a small minority of jurisdictions follow the balancing test approach advocated by the state.

In evaluating the rationales that other jurisdictions have proffered for and against giving full retroactive effect to new interpretations of criminal statutes, we deem it axiomatic that the policies governing the availability of habeas relief should reflect the purposes for which the remedy was established. See P. Mishkin, "Forward: The High Court, the Great Writ, and the Due Process of Time and Law," 79 Harv. L. Rev. 56, 79–80 (1965). The "great writ" traces its origins to "[c]hapter [t]hirty-nine of Magna Charta [which] reads: 'No Freeman shall be taken or imprisoned . . . except by the lawful judgment of his peers and by the law of the land.' " L. Ottenberg, "Magna Charta Documents: The Story Behind the Great Charter," 43 A.B.A. J. 495, 569 (1957); see also P. Halliday, Habeas Corpus: From England to Empire, (Harvard University Press 2010) c. 1, p. 15. The United States Supreme Court has made clear that the "great object" of the writ "is the liberation of those who may be imprisoned without sufficient cause." *Ex parte Watkins*, 28 U.S. (3 Peters) 193, 202, 7 L. Ed. 650 (1830). Because the writ is intended to safeguard "individual freedom against arbitrary and lawless state action," it must be "administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and cor-

("[b]ecause nonretroactivity is the general requirement only for new rules of criminal procedure, a new substantive rule is more properly viewed not as an exception to that requirement, but as a rule that will generally apply retroactively"), and *Clem* v. *State*, supra, 119 Nev. 626–28 (applying balancing test).

rected." *Harris* v. *Nelson*, 394 U.S. 286, 290–91, 89 S. Ct. 1082, 22 L. Ed. 2d 281 (1969). This court has taken the same view: "The principal purpose of the writ of habeas corpus is to serve as a bulwark against convictions that violate fundamental fairness. . . . To mount a successful collateral attack on his conviction, a prisoner must demonstrate . . . a fundamental unfairness or miscarriage of justice . . . ." (Citations omitted; internal quotation marks omitted.) *Summerville* v. *Warden*, 229 Conn. 397, 419, 641 A.2d 1356 (1994). The question presented is, therefore, whether and, if so, when a reinterpretation of a criminal statute renders final convictions obtained under a prior interpretation so arbitrary and unjust that the remedy of habeas is warranted.

We begin our analysis of the question by restating the well established principle that, when we interpret, or reinterpret, a statute, our "fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply." (Internal quotation marks omitted.) *Southern New England Telephone Co.* v. *Cashman*, 283 Conn. 644, 650, 931 A.2d 142 (2007).

It follows from this premise that, regardless of whether one reads *Salamon* to be a change or clarification of the law, the court in *Salamon* saw itself as discerning the original legislative meaning of § 53a-92 (a) (2) (A). *State* v. *Salamon*, supra, 287 Conn. 520 (" 'our only responsibility is to determine what the legislature, within constitutional limits, intended to do' "). If the legislature never intended an assault to constitute kidnapping, without evidence of the perpetrator's independent intent to restrain the victim, then the petitioner in the present case stands convicted of a crime that he

arguably did not commit. This conclusion raises serious due process concerns. It is well settled that "due process requires the state to prove every element of the offense charged beyond a reasonable doubt." *State* v. *Coltherst*, 263 Conn. 478, 494, 820 A.2d 1024 (2003). Indeed, even states such as New York and New Jersey, which have resolved similar cases according to a balancing test rather than a per se rule favoring full retroactivity, have made clear that where a new interpretation of a statute raises " 'serious questions about the accuracy of guilty verdicts in past trials,' " the balance will inevitably tip in favor of the petitioner. *State* v. *J.A.*, supra, 398 N.J. Super. 521; see also *Guzman* v. *Greene*, 425 F. Sup. 2d 298, 315 (E.D.N.Y. 2006). Under our system of justice, considerations of finality simply cannot justify the continued incarceration of someone who did not commit the crime of which he stands convicted.

We recognize that the petitioner did commit serious crimes, for which he was appropriately sentenced. Indeed, in many, if not most, of the cases where courts have confronted the retroactivity issue, the question was not whether an innocent person had been wrongly incarcerated, but rather, as here, whether a petitioner had been penalized for two crimes where the legislature intended only one. See, e.g., *People* v. *Mutch*, 4 Cal. 3d 389, 393–94, 482 P.2d 633, 93 Cal. Rptr. 721 (1971) (kidnapping and robbery); *Luke* v. *Battle*, supra, 275 Ga. 373 (aggravated sodomy and child molestation); *People* v. *Edgeston*, supra, 396 Ill. App. 3d 515–16, 521 (felony murder and residential burglary); *Jacobs* v. *State*, supra, 835 N.E.2d 486, 490 (general habitual offender and illegal handgun possession); *State* v. *Howard*, 211 Wis. 2d 269, 272–73, 564 N.W.2d 753 (1997) (firearm possession enhancement for drug conviction). Even in those cases, to provide collateral relief has been the rule rather than the exception. Courts have reasoned that to penalize a defendant twice, under two

different labels, for conduct that the legislature deemed to constitute a single crime, would be unjust to the defendant and would amount to a judicial usurpation of the legislature's authority to define the scope of criminal statutes. See, e.g., *People* v. *Rodriguez*, 355 Ill. App. 3d 290, 295–97, 823 N.E.2d 224 (2005) (sentence void where new interpretation of controlled substance statute indicated that legislature did not intend, and court was thus not authorized, to impose enhanced penalty); *State* v. *Whitehorn*, supra, 309 Mont. 69 (double sentencing not authorized by reinterpreted statute violates double jeopardy provisions of state constitution). We agree and, therefore, conclude that, when an appellate court provides a new interpretation of a substantive criminal statute, an inmate convicted under a prior, more expansive reading of the statute presumptively will be entitled to the benefit of the new interpretation on collateral attack.

We decline, however, the petitioner's invitation to adopt a per se rule in favor of full retroactivity. We do so because a review of the diverse contexts in which such challenges have arisen persuades us that there are various situations in which to deny retroactive relief may be neither arbitrary nor unjust. The most notable case on point is *Policano* v. *Herbert*, supra, 7 N.Y.3d 590–91, in which the petitioner, David Policano, approached the victim, who had struck him with a metal pipe the week before, and shot the victim four times, at close range. The state charged Policano with two counts of homicide—depraved indifference murder and intentional murder. Id., 592. Under N.Y. Penal Law § 125.25 (McKinney 2009), both charges constitute second degree murder and carry the same penalties. See *Policano* v. *Herbert*, 430 F.3d 82, 87 (2d Cir. 2005). Under the prevailing interpretation of the statute at the time of trial in 1998, depraved indifference murder was distinguished from intentional murder primarily by the

objective degree of risk created by a defendant's conduct. *Policano* v. *Herbert*, supra, 7 N.Y.3d 597, 602–603. Some homicides in which a perpetrator's actions were virtually certain to result in the victim's death could thus reasonably be characterized as either intentional or depraved indifference murders. Id., 601. The trial court instructed the jury that if it found Policano guilty on the depraved indifference murder charge, it should not reach the intentional murder charge. Id., 592. The jury, following this instruction, convicted Policano of depraved indifference murder. Id.

In a series of decisions issued after Policano's conviction became final, the New York Court of Appeals subsequently adopted what was arguably a new interpretation of N.Y. Penal Law § 125.25: an essential element of depraved indifference murder is that the perpetrator kill with a reckless, rather than intentional, mens rea. See *People* v. *Feingold*, 7 N.Y.3d 288, 294, 852 N.E.2d 1163, 819 N.Y.S.2d 691 (2006); *People* v. *Payne*, 3 N.Y.3d 266, 271–72, 819 N.E.2d 634, 786 N.Y.S.2d 116 (2004); *People* v. *Gonzalez*, 1 N.Y.3d 464, 467, 807 N.E.2d 273, 775 N.Y.S.2d 224 (2004). Under this interpretation, " 'a one-on-one shooting or knifing . . . can almost never qualify as depraved indifference murder' "; *Policano* v. *Herbert*, supra, 7 N.Y.3d 601; because such attacks typically evince a clear intent to kill.

Policano then filed a petition for a writ of habeas corpus in federal court, claiming that "the evidence produced at trial indicated that if [he] committed the homicide at all, he committed it with the conscious objective of killing the victim . . . ." Id., 595. Under the new interpretation of the statute, he reasoned, the jury could not reasonably have found him guilty of depraved indifference murder. Id. The District Court granted the petition; *Policano* v. *Herbert*, United States District Court, Docket No. 02-CV-1462 (JG), 2004 U.S. Dist. LEXIS 17785 (E.D.N.Y. September 7, 2009); and

the state appealed to the United States Court of Appeals for the Second Circuit, which initially affirmed the District Court's decision; *Policano* v. *Herbert,* supra, 430 F.3d 93; but later certified to the New York Court of Appeals the question whether decisions such as *Payne* and *Feingold* represented a change in New York's depraved indifference murder law, and, if so, whether the new interpretation should be applied retroactively. *Policano* v. *Herbert,* 453 F.3d 75, 76 (2d Cir. 2006). The New York Court of Appeals responded that the law had in fact changed; *Policano* v. *Herbert,* supra, 7 N.Y.3d 602–603; but it declined to afford the new interpretation full retroactivity. Id., 603. "[D]efendants who commit . . . vicious crimes but who may have been charged and convicted under the wrong section of the statute," the court concluded, "are not attractive candidates for collateral relief . . . ." (Internal quotation marks omitted.) Id., 604.[19] It would have been perverse to allow obviously dangerous criminals to "[get] away with murder . . . not because the evidence of [their] culpability is too weak, but because it is too strong." *Policano* v. *Herbert,* supra, 453 F.3d 80 (Raggi, J., dissenting from denial of rehearing en banc); see also id., 82 (deeming poor candidates for habeas relief petitioners who "are too guilty of murder . . . because they really intended to kill their victims . . . to be guilty of murder . . . on a theory of depraved indifference"); *Guzman* v. *Greene,* supra, 425 F. Sup. 2d 315 ("[c]learly, the purpose of the new rule was not to let murderers go free because they were 'convicted under the wrong section of the statute' ").

Similar rationales led the Indiana Court of Appeals to deny retroactive relief in *Powell* v. *State,* supra, 574

---

[19] This was especially true because a statute prohibiting successive prosecutions as double jeopardy barred the state from retrying Policano for intentional murder, notwithstanding that the jury, as instructed, never returned a verdict on that charge. *Policano* v. *Herbert,* supra, 453 F.3d 80–81 (Raggi, J., dissenting from denial of rehearing en banc).

N.E.2d 332, in which the petitioner caused two deaths while operating a motor vehicle while intoxicated. The petitioner was convicted of two counts of operating a motor vehicle while intoxicated resulting in death, a class C felony, under the then accepted interpretation of the statute allowing multiple deaths arising from a single collision to be charged separately. Id. The Indiana Supreme Court subsequently determined that when a single accident by an intoxicated driver results in multiple deaths, "such results do not increase the number of crimes, only the severity of the penalty." *Kelly* v. *State*, 539 N.E.2d 25, 26 (Ind. 1989). In denying the petitioner's motion to vacate the second conviction, the court reasoned, inter alia, that the state had relied heavily on the pre-*Kelly* interpretation of the statute. *Powell* v. *State*, supra, 334 and n.4. Had *Kelly* been the law at the time of trial, the court explained, the state could have obtained two comparable convictions for the deaths as reckless homicides, and the results would have been the same. Id., 334 n.4.[20]

---

[20] A third such case is *Kleve* v. *Hill*, 185 F.3d 1009, 1010 (9th Cir. 1999), in which the petitioner was convicted of conspiracy to commit second degree murder but acquitted of conspiracy to commit first degree murder. An intervening judicial decision subsequently determined that there is no crime of conspiracy to commit second degree murder under California law. *People* v. *Cortez*, 18 Cal. 4th 1223, 1237–38, 960 P.2d 537 (1998). In *Kleve*, the Ninth Circuit Court of Appeals denied habeas relief, however, finding that the petitioner's prior conviction of that crime necessarily implied that he was guilty of conspiracy to commit first degree murder. *Kleve* v. *Hill*, supra, 1013–14. The court did not believe that "mislabeling [the] petitioner's crime and punishing him with underserved leniency provide a basis for invalidating his conviction altogether." Id., 1014.

Justice Katz suggests that *Kleve* does not represent an exception to the per se rule in favor of full retroactivity, because she believes that a per se rule would not compel relief under the unique procedural posture of that case. We need not resolve that question here. For present purposes, the important point is that the court in *Kleve* permitted the petitioner's conviction of conspiracy to commit second degree murder to stand, despite having found that there is no such crime, because it determined that that charge could be seen as the "functional equivalent" of the first degree conspiracy charge of which he had been acquitted. Id.

Accordingly, we adopt a general presumption in favor of full retroactivity for judicial decisions that narrow the scope of liability of a criminal statute. That presumption, however, would not necessarily require that relief be granted in cases where continued incarceration would not represent a gross miscarriage of justice, such as where it is clear that the legislature did intend to criminalize the conduct at issue, if perhaps not under the precise label charged. In situations where the criminal justice system has relied on a prior interpretation of the law so that providing retroactive relief would give the petitioner an undeserved windfall, the traditional rationales underling the writ of habeas corpus may not favor full retroactivity. See *Guzman* v. *Greene*, supra, 425 F. Sup. 2d 315 ("it is certainly not unjust, let alone manifestly unjust, to keep a murderer in jail").[21]

We emphasize that in the *Salamon* context in particular, any exceptions to the general presumption in favor of full retroactivity are likely to be few and far between. As the California Supreme Court noted in providing full retroactive effect to a similar[22] reinterpretation of that state's kidnapping statutes, "it would indeed be an unusual circumstance in which a prosecutor might charge [kidnapping] but not the underlying robbery as

---

[21] In his concurrence, Justice Palmer contends that the federal due process clause may "require full retroactivity in all cases," which, he further suggests, implies that "rejecting a per se rule for purposes of our common law [might be] contrary to constitutional requirements . . . ." As we have explained, however, the United States Supreme Court has made clear that where a state court changes its interpretation of a statute, the constitution does *not* require retroactivity. Our common-law analysis assumes, arguendo, that *Salamon* did represent a change, rather than clarification, of the law.

[22] In *People* v. *Daniels*, 71 Cal. 2d 1119, 1139–40, 459 P.2d 225, 80 Cal. Rptr. 897 (1969), after a full review of the legislative history of California's kidnapping statutes, the California Supreme Court concluded that its prior statutory interpretation—allowing a conviction for kidnapping where the defendant restrained or moved a victim for the sole purpose of committing a robbery—was erroneous. In *People* v. *Mutch*, supra, 4 Cal. 3d 399, the court granted a habeas petitioner full retroactive relief under *Daniels*.

well, or, if both were charged, could convict the defendant of [kidnapping] but not robbery. And since [kidnapping] is the more serious offense, it is highly unlikely that a defendant would make a bargain to plead guilty to [kidnapping] in exchange for dismissal of the robbery charge; invariably, the converse occurs." *People* v. *Mutch*, supra, 4 Cal. 3d 398 n.7. The same may be said of the relationship between kidnapping and assault under Connecticut law.[23]

The state offers five rationales either for adopting a per se rule against retroactive relief or for denying relief in the present case: (1) the fact that law enforcement relied on the old interpretation of the kidnapping statutes while trying the petitioner; (2) the fact that the retroactive application of *Salamon* has no deterrent value or remedial purpose; (3) the fear that our courts will be "flooded" with habeas petitions from other inmates convicted under § 53a-92 (a) (2) (A); (4) the difficulty of retrying such cases where significant time has elapsed since conviction; and, perhaps most importantly (5) the concern that victims will be retraumatized by again having to testify and endure another round of judicial proceedings.

---

[23] In her concurrence, Justice Katz argues that the particular legal issues that arose in *Policano* are unlikely to arise under Connecticut law, so that it is unnecessary to depart from a per se rule in favor of full retroactivity. We agree with her premise, but not her conclusion. As we have explained, *Policano* is merely one example of a situation in which the rationales underlying the writ of habeas corpus may not justify relief, notwithstanding that a petitioner stands convicted of a crime that, as properly defined, he did not commit. We have pointed to several other examples as well. Such cases tend to arise out of the idiosyncrasies of state law, and it is impossible to predict when, and how, one might appear in Connecticut. Although we agree that such cases come up relatively infrequently, that in itself is no reason to adopt a rule that would compel relief should a situation arise where relief is clearly unwarranted.

Nor do we feel compelled to define here the precise circumstances under which full retroactivity would not be warranted. The important questions that Justice Katz asks in her concurring opinion should be answered in the context of a case in which they are actually implicated.

We are not unsympathetic to the legitimate concerns raised by the state, and by the amici, relating to the general importance of preserving the finality of criminal convictions. For the reasons that follow, however, we are convinced that the federal courts, as well as the majority of our sister states that have considered the question, have reached the proper conclusion: in cases such as this, the interests of finality must give way to the demands of liberty and a proper respect for the intent of the legislative branch.

We begin by reiterating that the majority approach in the United States is to provide even broader retroactive relief to habeas petitioners than is provided under the rule we announce today. Those jurisdictions that have adopted a per se rule in favor of full retroactivity have clearly determined that the concerns raised by the state, although legitimate, do not justify the denial of relief to petitioners convicted of conduct the legislature did not intend to criminalize. We are aware of no evidence that the repercussions have been significant enough to cause our sister states, or the federal courts, to regret adopting such a rule. To the contrary, as discussed previously in this opinion, over the past several years some states appear to have changed position and adopted the majority approach.

Moreover, many of the concerns raised by the state in the habeas context apply with equal force to direct appeals, in which it is undisputed that appellants receive the benefit of retroactive application of judicial decisions that narrow the scope of liability under a criminal statute. *State* v. *Sanseverino*, supra, 287 Conn. 620 n.11. *Sanseverino* provides an instructive case in point. The crimes charged in that case commenced in June or July of 1998; id., 613; a mere two to three months after the incident for which the petitioner in the present case was convicted. Whereas the petitioner's conviction became final in 2003, however, *Sanseverino* was still

under review when we decided *Salamon* in 2008. Any concerns regarding prosecutorial reliance and the burdens associated with retrying a ten year old crime apply to *Sanseverino* no less than to the present case.[24] The same may be said of cases such as *Fiore*, wherein the due process clause compels the states to provide retroactive relief to certain habeas petitioners.

Turning to the state's specific arguments against providing retroactive relief, it first contends that "[f]or more than three decades prior to the decision in *Salamon*, prosecutors relied on *this* [c]*ourt's* interpretation of the kidnapping statutes in making their charging decisions." (Emphasis in original.) As we have discussed, one can conceive of circumstances in which prosecutors rely on a prior interpretation of a statute to such an extent that retroactive application of a different subsequent interpretation might not be warranted.[25]

---

[24] We do not mean to imply that there are no relevant distinctions between direct appeals and collateral attacks on final judgments sufficient to justify retroactivity in the former context where it might not be appropriate for the latter. We merely note that one necessary cost accompanying a precedential judicial system such as ours, which "has a built-in presumption of retroactivity"; *Solem* v. *Stumes*, 465 U.S. 638, 642, 104 S. Ct. 1338, 79 L. Ed. 2d 579 (1984); is that there will be times when courts will be forced to disturb the settled soils of justice.

[25] Indeed, one of our primary concerns about Justice Katz' analysis is that she appears to undervalue the importance of the state's reliance interest in cases such as *Policano* v. *Herbert*, supra, 7 N.Y.3d 588, *Powell* v. *State*, supra, 574 N.E.2d 331, and *Kleve* v. *Hill*, 185 F.3d 1009 (9th Cir. 1999). At several points in her concurrence, Justice Katz suggests that where the law has changed so that a petitioner was not formally guilty of the crime of which he was convicted, but could instead have been convicted of a comparable crime, the proper remedy is retrial by jury. However, where a prior conviction leaves no doubt that the jury would have convicted a petitioner of a comparable—or more serious—crime if charged under a proper interpretation of the law, we see no reason to require the state, and the victims, to go through the formality of a new trial. See, e.g., *Kleve* v. *Hill*, supra, 1013–14 (conviction of conspiracy to commit second degree murder was "functional equivalent" of finding petitioner guilty of conspiracy to commit first degree murder); *Powell* v. *State*, supra, 332 (conviction of operating motor vehicle while intoxicated resulting in death implies petitioner also could have been convicted of reckless homicide).

This is not such a case. Here, the petitioner was charged with every crime for which he might reasonably have been held liable:[26] attempt to commit sexual assault in the first degree; kidnapping in the first degree; attempt to commit murder; assault in the second degree; and being a persistent dangerous felony offender. See *State v. Luurtsema*, supra, 262 Conn. 179. He was convicted of—and received the maximum sentence for—the underlying offenses of both assault in the second degree and attempted sexual assault in the first degree. Id., 181–82. In sum, the record discloses no indication that the state would have charged the petitioner differently had it anticipated the subsequent interpretation of § 53a-92 (a) (2) (A) in *Salamon*.[27]

The state next argues, in essence, that the present case is unlike habeas cases where a petitioner alleges that evidence obtained in violation of his constitutional rights should have been excluded at trial. Here, unlike in exclusionary rule cases, providing collateral relief will not deter or call attention to any misconduct on the part of the state, because prosecutors and law enforcement acted on a good faith belief that our prior interpretation of § 53a-92 (a) (2) (A) was the governing law. The short answer to this argument is that the petitioner has not contended that we should grant him retroactive relief so as to deter official misconduct. He simply asks that he not be made to serve forty-five years in prison for conduct that the legislature only deemed to be a twenty-five year offense.

---

[26] We do not foreclose the possibility that, should the petitioner prevail in his habeas proceeding, the state may charge him with the lesser included crime of unlawful restraint, in addition to or in lieu of kidnapping. See *State v. Sanseverino*, supra, 291 Conn. 579.

[27] At oral argument, the state offered no suggestion that it relied at trial on the prior interpretation of § 53a-92 (a) (2) (A), such as by failing to present evidence of the petitioner's intent to restrain the victim for some purpose other than to assault her. If such evidence does exist, the state will have the opportunity to present it at a retrial.

The state's third argument is that a "finding of retroactivity would flood the court system with habeas petitioners seeking to overturn kidnapping convictions . . . ." It further contends that many of these petitions will require new trials, magnifying the burdens on the judicial system. There is little doubt that some petitioners will come forward contending that they are serving substantially longer sentences than are prescribed by the criminal code, as properly construed. In its brief, however, the state has identified only five such petitions that have been filed in the more than two years since we decided *Salamon* and *Sanseverino*. At oral argument before this court, the state declined to provide additional information as to the number of present inmates who might have a colorable claim under *Salamon*. Of the 1.5 percent of department of correction inmates incarcerated for kidnapping or unlawful restraint, one can reasonably assume that only a small subset will fall within the ambit of *Salamon*.[28] Of those, we expect that courts will be able to dispose summarily of many cases where it is sufficiently clear from the evidence presented at trial that the petitioner was guilty of kidnap-

[28] See Office of Legislative Research, Research Report No. 2008-R-0589, "Breakdown of Prison Population by Offense Categories" (October 22, 2008), available at http://www.cga.ct.gov/2008/rpt/2008-R-0589.htm (last visited January 5, 2011) (copy contained in file of this case in Supreme Court clerk's office) (providing data on sentenced and unsentenced department of correction inmates, by most serious offense, as of October 21, 2008); accord *Sheff* v. *O'Neill*, 238 Conn. 1, 38 n.42, 678 A.2d 1267 (1996) (taking judicial notice of statistics compiled by Hartford board of education); 29 Am. Jur. 2d 134, Evidence § 109 (2008) ("Courts take judicial notice of statistical facts of general and common knowledge. Federal records and statistics are recognized as public records of which courts may take judicial notice."); 29 Am. Jur. 2d, supra, § 157 (judicial notice taken of official public records of state department of correction). Of those inmates incarcerated for kidnapping and related crimes, some have yet to be sentenced, or to have completed their direct appeal, and others were convicted of unlawful restraint rather than kidnapping. Even among those inmates whose kidnapping convictions have become final, many exhibited a clear intent to abduct their victims, and so are not in a position to benefit from *Salamon*.

ping, as properly defined, that any error arising from a failure to instruct the jury in accordance with the rule in *Salamon* was harmless. See, e.g., *State* v. *Hampton*, 293 Conn. 435, 463–64, 978 A.2d 1089 (2009). Likewise, we doubt the state will expend the resources to retry cases where it is reasonably clear that a petitioner could not have been convicted of kidnapping under the correct interpretation of the statute.

The state's fourth argument against applying *Salamon* retroactively on collateral attack is that the passage of time or unavailability of witnesses may preclude the state from retrying some cases, leading to the release of dangerous criminals. We emphasize, however, that today's decision does not throw open the jailhouse doors. Inmates such as the petitioner, who have been convicted of kidnapping predicated on an assault, will continue to serve out the sentence for the underlying crime, as the legislature intended. If there are cases in which a petitioner was not convicted of the underlying assault, in reliance on a pre-*Salamon* interpretation of § 53a-92 (a) (2) (A), we have left open the possibility that retroactive relief may not be available.

We agree in this regard with the Georgia Supreme Court, which addressed a similar challenge in *Luke* v. *Battle*, supra, 275 Ga. 370. In *Luke*, the Georgia Supreme Court afforded full retroactive effect to *Brewer* v. *State*, 271 Ga. 605, 607, 523 S.E.2d 18 (1999), a case in which it had reinterpreted Georgia's aggravated sodomy statute to add a force requirement. Addressing the dissent's concerns that providing relief to habeas petitioners would "[open] the floodgate"; *Luke* v. *Battle*, supra, 378 (Carley, J., dissenting); the court explained: "As for the dissent's emotional assertion that our holding today might 'vacate the convictions of an untold number of child molesters,' there are two fair and just responses. One is that today's opinion does not vacate the child

molestation conviction of any defendant also convicted of aggravated sodomy before our decision in *Brewer*. The other, more important, response is that the only defendants who will have their aggravated sodomy convictions overturned are those convicted of an act that the aggravated sodomy statute does not make criminal. Overturning the conviction of a person not guilty of the crime for which he was convicted goes to the heart of our habeas corpus system and our American system of justice." Id., 375; see also *People* v. *Mutch*, supra, 4 Cal. 3d 398 n.7 (noting likelihood that defendants whose kidnapping convictions would be affected by decision to provide full retroactive relief after reinterpretation of kidnapping statute also had been convicted of robbery and other felonies); *Chao* v. *State*, supra, 931 A.2d 1002–1003 (almost all prisoners affected by decision would continue to serve significant sentences because of convictions of other crimes in addition to felony murder).

We next address the state's contention that it is not unjust to uphold the petitioner's kidnapping sentence where: (1) his conduct was morally culpable; and (2) he had adequate notice that such conduct was deemed to constitute kidnapping under the then prevailing interpretation of the law. As to the first claim, culpable conduct alone is necessary, but not sufficient, for the legitimate exercise of the state's power to incarcerate. To constitute a crime, forbidden conduct must be accompanied by a clearly prescribed legal penalty. See generally *United States* v. *Evans*, 333 U.S. 483, 486, 68 S. Ct. 634, 92 L. Ed. 823 (1948); see also *United States* v. *Hudson & Goodwin*, 11 U.S. (7 Cranch) 32, 34, 3 L. Ed. 259 (1812); *Mossew* v. *United States*, 266 F. 18, 20 (2d Cir. 1920); W. LaFave & A. Scott, Criminal Law (1972) § 2, p. 8. The question, then, is whether there was a clearly prescribed legal penalty where this court put the petitioner on notice that he could be convicted

of conduct that the legislature did not in fact criminalize. To ask the question is to answer it. The adoption of the comprehensive Penal Code in 1969 abrogated the common-law authority of Connecticut courts to impose criminal liability for conduct not proscribed by the legislature. *Valeriano* v. *Bronson*, 209 Conn. 75, 92, 546 A.2d 1380 (1988). As we explained in *State* v. *Breton*, 212 Conn. 258, 268–69, 562 A.2d 1060 (1989), "the power to define crimes and to designate the penalties therefor resides in the legislature. . . . Courts must avoid imposing criminal liability where the legislature has not expressly so intended. . . . Thus, we construe penal statutes strictly in favor of the accused." (Citations omitted.) See also *United States* v. *Loschiavo*, 531 F.2d 659, 667 (2d Cir. 1976) (rejecting similar argument made by state). A court cannot give notice of the illegality of conduct that it lacks the authority to prohibit.[29]

Finally, the state and amici raise the concern that victims and other witnesses will be forced to relive violent and degrading events, especially if they are called upon to testify again at a retrial.[30] We have deep compassion for those individuals who have already been made twice to endure the curse of crime, once as victim and again as witness. We cannot, however, permit our sympathy for assault victims, and our desire to provide them with a sense of closure and to spare them further trauma, to obscure our duty to ensure that per-

---

[29] The state also argues that to make *Salamon* fully retroactive would violate the principles of res judicata and collateral estoppel. The sole case that the state cites for that proposition, however, is *Marone* v. *Waterbury*, 244 Conn. 1, 11 n.10, 707 A.2d 725 (1998). Because *Marone* was a civil action, in which considerations of finality differ substantially from the habeas context, it is inapposite.

[30] In its brief, the state argues that making *Salamon* retroactive in habeas cases would be unjust and traumatic for victims. The amici further contend that to do so would violate article first, § 8 (b), of the constitution of Connecticut. Because the parties themselves have not raised the constitutional challenges at trial or on appeal, we do not address them. See *Fisher* v. *Big Y Foods, Inc.*, 298 Conn. 414, 416 n.3, 3 A.3d 919 (2010).

petrators are sentenced only for conduct that the legislature intended to criminalize, and only to the extent that the legislature intended. We have confidence that the state will take these concerns regarding victims into account when deciding whether to reprosecute cases. We also take to heart the words of our sister court in the state of Washington: "[W]e are aware that some of these cases involve horrifying conduct . . . . The cost in terms of human anguish is immeasurable. Judges are not immune to these horrors. Yet, to assure lawful and fair treatment of all persons convicted under a statute that did not criminalize their acts . . . these petitioners are entitled to relief. Our obligation is to see that the law is carried out uniformly and justly." *In re Hinton*, 152 Wn. 2d 853, 856, 100 P.3d 801 (2004).

## II

We turn finally to the second reserved question, whether this court's interpretation of § 53a-92 (a) (2) (A) in *Salamon* should apply retroactively in the present case. Because the rationales underlying the general presumption in favor of full retroactivity apply here, we conclude that it should.

This is not a case like *Powell* v. *State*, supra, 574 N.E.2d 334 n.4, in which the state, in selecting the crimes with which to charge the petitioner, can plausibly be said to have relied to its detriment on the prior interpretation of the kidnapping statutes. The petitioner in the present case was charged with, and convicted of, the assault and attempted sexual assault of the victim. The maximum twenty-five year sentence that he received for those crimes remains undisturbed.

At the same time, the court's thorough review of the legislative history of § 53a-92 (a) (2) (A) in *Salamon* made clear that the legislature never intended that a single crime be subject to dual liability, both as assault and as kidnapping, without evidence that the petitioner

intended to restrain the victim more than was necessary to effect the underlying assault. Although we discern no such evidence in the current record, if the petitioner prevails at his habeas trial the state is not foreclosed from retrying him for kidnapping under the proper standard. In *State* v. *DeJesus*, supra, 288 Conn. 434, we determined that the state should have the opportunity to retry such cases before a properly instructed jury, submitting any evidence it might have tending to prove that the petitioner intended to restrain the victim to a greater extent or for longer than was necessary to assault her. See also *State* v. *Sanseverino*, supra, 291 Conn. 588 ("[W]hen the state has presented evidence sufficient to support the defendant's conviction under the legal standard that existed at the time of trial, an unforeseen change in that legal standard, although requiring reversal of the conviction, ordinarily does not also require a judgment of acquittal. . . . Rather, the state is entitled to retry the defendant under the new standard. . . ." [Citation omitted; internal quotation marks omitted.]). We agree with the state that the same rationale applies here.

We reject the petitioner's contention that he, unlike the defendant in *DeJesus*, should not be subject to retrial because at trial he urged the court to adopt the definition of kidnapping that the court ultimately adopted in *Salamon*, and hence "put the [s]tate on notice" that it might have to prove him guilty under that stricter standard. To so hold would be to require the state to attempt to prove a defendant's guilt under any novel theory of the law that he might propose, lest an appellate court later embrace it. This would unduly burden the state and squander judicial resources.

The reserved questions are answered in the affirmative.

No costs will be taxed in this court to any party.

In this opinion EVELEIGH and VERTEFEUILLE, Js., concurred.

KATZ, J., concurring. In *State* v. *Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008), this court recognized that, contrary to our long-standing interpretation of the kidnapping statutes, the legislature never had intended for confinement or movement of a victim that was merely incidental to the commission of another crime to constitute kidnapping. As the plurality properly recognizes, the question in the present case of whether the petitioner, Peter Luurtsema, whose conviction was rendered final before that decision was issued, is entitled to collaterally attack his conviction on the basis of *Salamon* raises two potential questions: first, whether it violates due process to allow the petitioner's conviction for kidnapping to stand; and second, whether, under our common-law authority, *Salamon* must be applied retroactively to the petitioner's conviction. Although recognizing the obvious due process implications, the plurality declines to decide the first question, which indisputably would require consistent treatment of habeas petitioners under like legal circumstances. Instead, it crafts a novel rule of retroactivity under our common-law authority, under which habeas courts may decline to afford relief "where it is clear that the legislature did intend to criminalize the conduct at issue, if perhaps not under the precise label charged." In so doing, the plurality eschews the approach taken by the overwhelming majority of jurisdictions to consider this question, which apply a per se rule of retroactive application of a decision narrowing the scope of conduct deemed criminal under a statute. I would conclude that it violates due process to allow the petitioner's conviction for kidnapping to stand in light of *Salamon*. I further would conclude that, even if it were necessary to decide this case under our common-law authority, we should adopt a per se rule that decisions narrowing the interpretation of criminal statutes apply retroactively.

## I

Turning first to the due process question, it seems clear to me that we cannot properly avoid deciding this question, despite the fact that it requires us to resolve what the majority characterizes as "the thorny question of whether [*Salamon*] represented the sort of clarification of the law for which the federal constitution *requires* collateral relief under *Fiore* [v. *White*, 531 U.S. 225, 121 S. Ct. 712, 148 L. Ed. 2d 629 (2001)]." (Emphasis in original.) It undoubtedly is a well settled principle that "we eschew *unnecessarily* deciding constitutional questions . . . ."[1] (Emphasis added.) *Hogan* v. *Dept. of Children & Families*, 290 Conn. 545, 560, 964 A.2d 1213 (2009); accord *State* v. *Lemon*, 248 Conn. 652, 663 n.15, 731 A.2d 271 (1999); *State* v. *Floyd*, 217 Conn. 73, 89, 584 A.2d 1157 (1991); *Negron* v. *Warden*, 180 Conn. 153, 166, 429 A.2d 841 (1980). Resolution of the constitutional question in the present case, however, is necessary.

In *Fiore* v. *White*, supra, 531 U.S. 226, the United States Supreme Court explained that the due process inquiry implicated when a state's highest court narrows the scope of conduct previously deemed criminal under a state statute turns on the state court's characterization of the decision as either clarifying or changing the law. As I explain later in greater detail, a clarification implicates due process concerns, whereas a change implicates retroactivity principles. The court unequivocally

---

[1] Indeed, this principle is applied most often in circumstances in which the resolution of a nonconstitutional question is an essential predicate to the constitutional issue, such as the proper interpretation or application of the statute that is being challenged on constitutional grounds. See, e.g., *Hogan* v. *Dept. of Children & Families*, 290 Conn. 545, 560, 964 A.2d 1213 (2009); *Pasquariello* v. *Stop & Shop Cos.*, 281 Conn. 656, 662, 916 A.2d 803 (2007); *Cumberland Farms, Inc.* v. *Groton*, 262 Conn. 45, 57, 808 A.2d 1107 (2002); *State* v. *Campbell*, 224 Conn. 168, 175, 617 A.2d 889 (1992), cert. denied, 508 U.S. 919, 113 S. Ct. 2365, 124 L. Ed. 2d 271 (1993); *In re Valerie D.*, 223 Conn. 492, 532 n.35, 613 A.2d 748 (1992); *State* v. *Rinaldi*, 220 Conn. 345, 353, 599 A.2d 1 (1991).

stated that, when a decision clarifies what the statute meant at the time of the petitioner's conviction, "retroactivity is not at issue."[2] Id.; id., 228 ("[b]ecause [the state court's later decision] was not new law, this case presents no issue of retroactivity"); see also *Bunkley* v. *Florida*, 538 U.S. 835, 840, 123 S. Ct. 2020, 155 L. Ed. 2d 1046 (2003) ("Because Pennsylvania law—as interpreted by the later State Supreme Court decision—made clear that . . . [the] conduct [of William Fiore, the petitioner in *Fiore* v. *White*, supra, 531 U.S. 225] did not violate an element of the statute, his conviction did not satisfy the strictures of the Due Process Clause. Consequently, 'retroactivity [was] not at issue.' . . . *Fiore* controls the result here. As [Florida Supreme Court] Justice Pariente stated in dissent, 'application of the due process principles of *Fiore*' may render a retroactivity analysis 'unnecessary.'" [Citations omitted.]). The analysis applied by numerous other courts reflects a clear understanding that the due process question is determinative of whether retroactivity is even implicated.[3] See, e.g., *Henry* v. *Ricks*, 578 F.3d 134,

---

[2] This point is manifest in the question certified to the state's highest court when the matter first came before the United States Supreme Court, wherein it articulated its question as follows: "We respectfully request that the Pennsylvania Supreme Court accept our certification petition because, in our view, the answer to this question will help determine the proper state-law predicate for our determination of the federal constitutional questions raised in this case." *Fiore* v. *White*, 528 U.S. 23, 29, 120 S. Ct. 469, 145 L. Ed. 2d 353 (1999).

[3] The Ninth Circuit case cited by the plurality, *Kleve* v. *Hill*, 243 F.3d 1149 (9th Cir.), cert. denied, 534 U.S. 948, 122 S. Ct. 341, 151 L. Ed. 2d 257 (2001), is not to the contrary. That court reconsidered its decision affirming a denial of habeas relief upon remand by the United States Supreme Court in light of *Fiore*. The Ninth Circuit concluded: "There is nothing in our earlier decision in this case that is inconsistent with the Supreme Court's decision in *Fiore*." Id., 1151. It noted two reasons for its conclusion: first, the decision at issue that was rendered subsequent to the petitioner's conviction "may have changed the law," which would not violate due process concerns; id.; and second, even if the later decision did change the law, the petitioner's conviction was proper under that law as stated in that later decision. Id.

With respect to the Florida decision cited by the plurality, *Thompson* v. *State*, 887 So. 2d 1260, 1262–64 (Fla. 2004), I would agree that the Florida

138–41 (2d Cir. 2009); *Chapman* v. *LeMaster*, 302 F.3d 1189, 1195–98 (10th Cir. 2002), cert. denied, 538 U.S. 980, 123 S. Ct. 1782, 155 L. Ed. 2d 671 (2003); *Dixon* v. *Miller*, 293 F.3d 74, 79 (2d Cir.), cert. denied sub nom. *Dixon* v. *Keane*, 537 U.S. 955, 123 S. Ct. 426, 154 L. Ed. 2d 305 (2002); *People* v. *Wenzinger*, 155 P.3d 415, 420 (Colo. App. 2006); *Bryant* v. *State*, 280 Kan. 2, 10–11, 118 P.3d 685 (2005); *Nika* v. *State*, 124 Nev. 1272, 1286, 198 P.3d 839 (2008), cert. denied, 558 U.S. 955, 130 S. Ct. 414, 175 L. Ed. 2d 284 (2009); *People* v. *McCrae*, 68 App. Div. 3d 1451, 1452, 892 N.Y.S.2d 574 (2009); *Hernandez* v. *Kelly*, 108 Ohio St. 3d 395, 399, 844 N.E.2d 301 (2006); *In re Personal Restraint of Hinton*, 152 Wn. 2d 853, 859–61, 100 P.3d 801 (2004).

Moreover, the plurality acknowledges the obvious due process concerns implicated in the present case. It notes: "[R]egardless of whether one reads *Salamon* to be a change or clarification of the law, the court in *Salamon* saw itself as discerning the original legislative meaning of [General Statutes] § 53a-92 (a) (2) (A). . . . If the legislature never intended an assault to constitute kidnapping, without evidence of the perpetrator's independent intent to restrain the victim, then the petitioner in the present case stands convicted of a crime that he arguably did not commit. This conclusion raises serious due process concerns." (Citation omitted.) Given this acknowledgment, I see no justification for avoiding the constitutional question.

Supreme Court addressed retroactivity before discussing due process concerns. I simply would point out that this approach stems from the rule eventually crystallized in the following statement by that court: "[S]ince we have now squarely held that all decisions of this Court disagreeing with a statutory construct previously rendered by a district court constitute 'changes' in the applicable law from the law at the time of conviction, we recede from the 'clarification/change' scheme . . . ." *State* v. *Barnum*, 921 So. 2d 513, 528 (Fla. 2005), cert. denied, 549 U.S. 993, 127 S. Ct. 493, 166 L. Ed. 2d 365 (2006).

Of course, as the plurality recognizes, answering that question would require us to weigh in on a matter over which there is a split of authority as to when a decision may be deemed clarifying. Nonetheless, that fact should not dictate our approach to deciding the present case or dissuade us from this task. Accordingly, I turn to the due process question.

Prior to *Fiore*, it had been a well settled principle that "state courts are under no [federal] constitutional obligation to apply their decisions retroactively." (Internal quotation marks omitted.) *Fiore* v. *White*, supra, 531 U.S. 227, quoting *Fiore* v. *White*, 149 F.3d 221, 222 (3d Cir. 1998); see generally *Great Northern Railway Co.* v. *Sunburst Oil & Refining Co.*, 287 U.S. 358, 364–65, 53 S. Ct. 145, 77 L. Ed. 360 (1932); see also *Wainwright* v. *Stone*, 414 U.S. 21, 23–24, 94 S. Ct. 190, 38 L. Ed. 2d 179 (1973); *Henry* v. *Ricks*, supra, 578 F.3d 140. In *Fiore*, the Supreme Court granted certification to consider "when, or whether, the Federal Due Process Clause requires a state to apply a new interpretation of a state criminal statute retroactively to cases on collateral review." *Fiore* v. *White*, supra, 531 U.S. 226; see also *Bunkley* v. *Florida*, supra, 538 U.S. 839 (applying *Fiore* analysis). Specifically, as in the present case, *Fiore*, and later *Bunkley*, presented circumstances in which postconviction relief had been sought on the basis of a later decision by the state's highest court construing more narrowly the statute under which the petitioner had been convicted.[4]

---

[4] In *Fiore*, the Pennsylvania Supreme Court had declined to review the decision of an appellate court rejecting the argument of the petitioner, Fiore, that he could not be convicted of violating a statute barring the operation of a hazardous waste facility without a permit for deviating from the terms of such a permit. *Fiore* v. *White*, supra, 531 U.S. 226–27. The Pennsylvania Supreme Court later agreed to review the conviction of Fiore's codefendant, and concluded that a person who has a permit, but deviates from its terms, does not violate the statute. Id., 227. In answer to a question reserved to it by the United States Supreme Court, the Pennsylvania court concluded that its decision in the case of Fiore's codefendant was a clarification of the law that stated the correct interpretation of the statute at the time Fiore's conviction became final. Id., 228.

To determine whether that precise question in fact had been presented in *Fiore*, the United States Supreme Court asked the state's highest court to indicate whether its decision interpreting the statute was a change in the law, or whether it was, instead, a correct statement of the law when the petitioner's conviction became final. *Fiore* v. *White*, supra, 531 U.S 226. The Pennsylvania Supreme Court replied that "[its] interpretation . . . 'merely clarified' the statute and was the law of Pennsylvania—as properly interpreted—at the time of Fiore's conviction." Id., 228. In light of this characterization, the United States Supreme Court held that, the Pennsylvania court's response "has now made clear that retroactivity is not at issue. At the same time, that court's interpretation of its statute makes clear that Fiore did not violate the statute." Id., 226. The Supreme Court noted that it violates due process for a state to "convict [a defendant] for conduct that its criminal statute, *as properly interpreted*, does not prohibit."

In *Bunkley*, a Florida appellate court had affirmed Clyde Timothy Bunkley's conviction for burglary in the first degree on the basis of his being armed with a "dangerous weapon," namely, a pocketknife with a blade approximately three inches in length that Bunkley neither had used nor threatened to use during the commission of the burglary. *Bunkley* v. *Florida*, supra, 538 U.S. 836. Bunkley unsuccessfully sought postconviction relief after the Florida Supreme Court interpreted for the first time, in a different case, the "common pocketknife" exception to the statutory definition of "weapon" to mean a pocketknife with a blade of less than four inches. Id., 837–38. The Florida Supreme Court concluded that Bunkley was not entitled to relief because: (1) its decision represented a change in the law that culminated a " 'century-long evolutionary process' " in the meaning of the pocketknife exception, and that such an evolutionary refinement does not apply retroactively under Florida precedent. Id., 840–41. Because it concluded that this analysis did not answer the *Fiore* due process question, the United States Supreme Court remanded the case back to the Florida Supreme Court for a determination as to whether, under this " 'evolutionary refinement' "; id., 840; the law had changed before or after Bunkley's conviction was rendered final. Id., 842. On remand, the Florida Supreme Court concluded that Bunkley properly had been convicted under the law as it existed at the time of his conviction. *Bunkley* v. *State*, 882 So. 2d 890, 894–96 (Fla. 2004), cert. denied, 543 U.S. 1079, 125 S. Ct. 939, 160 L. Ed. 2d 822 (2005).

(Emphasis added.) Id., 228. Accordingly, the court held: "This Court's precedents make clear that Fiore's conviction and continued incarceration on this charge violate due process. We have held that the Due Process Clause of the Fourteenth Amendment forbids a State to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt." Id., 228–29. Because the Pennsylvania court's clarification meant that Fiore's conviction was not based on proof of all of the requisite elements of the offense for which he was convicted, the Supreme Court concluded that "[t]he simple, inevitable conclusion is that Fiore's conviction fails to satisfy the Federal Constitution's demands." Id., 229.

Thereafter, in *Bunkley* v. *Florida,* supra, 538 U.S. 840–42, the Supreme Court sought similar clarification of a case in which the Florida Supreme Court had characterized its subsequent interpretation of a criminal statute as an " 'evolutionary refinement' . . . ." Id., 840. Because, on remand, the Florida Supreme Court determined that its later decision did not control at the time of the petitioner Clyde Timothy Bunkley's conviction, due process was not offended by the conviction, and the court could decide the case on grounds of retroactivity. *Bunkley* v. *State,* 882 So. 2d 890, 894–96 (Fla. 2004), cert. denied, 543 U.S. 1079, 125 S. Ct. 939, 160 L. Ed. 2d 822 (2005).

*Fiore* and *Bunkley* make clear that the due process question turns on this change/clarification dichotomy. Although in either case a corrected interpretation, if based on legislative intent, as opposed to constitutional constraints, reveals that the legislature never intended to criminalize particular conduct, apparently only those decisions deemed clarifying implicate due process concerns. I question the logic of this distinction.[5] Nonethe-

---

[5] Specifically, I question why due process does not demand application of any decision interpreting more narrowly the scope of a criminal statute. It cannot be said that the court is not stating what the legislature always

less, we can resolve the issue in the present case without running afoul of this distinction.

The United States Supreme Court has not dictated the circumstances under which a state court's decision

intended. In the context of a newly articulated *constitutional* rule, the Supreme Court has recognized that "the very word 'retroactivity' is misleading because it speaks in temporal terms. 'Retroactivity' suggests that when we declare that a new constitutional rule of criminal procedure is 'nonretroactive,' we are implying that the right at issue was not in existence prior to the date the 'new rule' was announced. But this is incorrect. As we have already explained, the source of a 'new rule' is the Constitution itself, not any judicial power to create new rules of law. Accordingly, the underlying right necessarily pre-exists our articulation of the new rule. What we are actually determining when we assess the 'retroactivity' of a new rule is not the temporal scope of a newly announced right, but whether a violation of the right that occurred prior to the announcement of the new rule will entitle a criminal defendant to the relief sought." *Danforth* v. *Minnesota*, 552 U.S. 264, 271, 128 S. Ct. 1029, 169 L. Ed. 2d 859 (2008); see also *American Trucking Assns., Inc.* v. *Smith*, 496 U.S. 167, 201, 110 S. Ct. 2323, 110 L. Ed. 2d 148 (1990) (Scalia, J., concurring) ("[P]rospective decisionmaking is incompatible with the judicial role, which is to say what the law is, not to prescribe what it shall be. The very framing of the issue that we purport to decide today—whether our decision . . . shall 'apply' retroactively—presupposes a view of our decisions as *creating* the law, as opposed to *declaring* what the law already is. Such a view is contrary to that understanding of 'the judicial Power,' U.S. Const., Art. III, § 1, which is not only the common and traditional one, but which is the only one that can justify courts in denying force and effect to the unconstitutional enactments of duly elected legislatures, see *Marbury* v. *Madison*, [5 U.S. (1 Cranch) 137, 2 L. Ed. 60] (1803)—the very exercise of judicial power asserted in [the prior decision]. To hold a governmental Act to be unconstitutional is not to announce that *we* forbid it, but that the *Constitution* forbids it; and when, as in this case, the constitutionality of a state statute is placed in issue, the question is not whether some decision of ours 'applies' in the way that a law applies; the question is whether the Constitution, as interpreted in that decision, invalidates the statute. Since the Constitution does not change from year to year; since it does not conform to our decisions, but our decisions are supposed to conform to it; the notion that our interpretation of the Constitution in a particular decision could take prospective form does not make sense. Either enforcement of the statute at issue . . . was unconstitutional, or it was not; if it was, then so is enforcement of all identical statutes in other States, whether occurring before or after our decision; and if it was not, then [our prior decision] was wrong, and the issue of whether to 'apply' that decision needs no further attention." [Emphasis in original.]). In my view, the same reasoning applies when this court interprets a statute enacted by the legislature and should require application of the later interpretation in every case as a matter of due process.

interpreting a criminal statute will be deemed to clarify or change the law.[6] Instead, the court has indicated that it is a matter for state courts to determine the effect of their own decisions construing state criminal statutes. See *Bunkley* v. *Florida,* supra, 538 U.S. 840–42 (relying on state court's answer to certified questions as to whether state court interpretation of state criminal statute reflected change in, rather than clarification of, state law); *Fiore* v. *White,* 528 U.S. 23, 25, 120 S. Ct. 469, 145 L. Ed. 2d 353 (1999) ("[b]efore deciding whether the Federal Constitution requires that Fiore's conviction be set aside in light of [*Commonwealth* v. *Scarpone,* 535 Pa. 273, 634 A.2d 1109 (1993)], we first must know whether Pennsylvania itself considers *Scarpone* to have explained what [the statute] always meant, or whether Pennsylvania considers *Scarpone* to have changed the law"); *Graves* v. *Ault,* 614 F.3d 501, 511 (8th Cir.) (*"Fiore* relied exclusively on the state supreme court's determination of what conduct the criminal statute prohibited at the time of the conviction. In *Bunkley,* the [United States Supreme] Court could not answer the *Fiore* question without determining what conduct the statute criminalized at the time of the conviction, so the Court remanded the case to the state supreme court to make

---

[6] By contrast, the United States Supreme Court has set parameters for determining when *federal* case law sets forth a new *constitutional* rule. See *Teague* v. *Lane,* 489 U.S. 288, 301, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989) ("It is admittedly often difficult to determine when a case announces a new rule, and we do not attempt to define the spectrum of what may or may not constitute a new rule for retroactivity purposes. In general, however, a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government. See, e.g., *Rock* v. *Arkansas,* 483 U.S. 44, 62 [107 S. Ct. 2704, 97 L. Ed. 2d 37] [1987] [per se rule excluding all hypnotically refreshed testimony infringes impermissibly on a criminal defendant's right to testify on his behalf]; *Ford* v. *Wainwright,* 477 U.S. 399, 410 [106 S. Ct. 2595, 91 L. Ed. 2d 335] [1986] [eighth amendment prohibits the execution of prisoners who are insane]. To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." [Emphasis in original.]).

that determination."), cert. denied, 562 U.S. 1006, 131 S. Ct. 508, 178 L. Ed. 2d 377 (2010); *Warren* v. *Kyler*, 422 F.3d 132, 137 (3d Cir. 2005) ("[I]t matters whether a state decision has established a new rule of law or merely clarified existing state law. But important as it may be, we read nothing in *Fiore* that authorizes us to make that kind of distinction based on our independent analysis of the effect of a state court's decision."), cert. denied sub nom. *Warren* v. *Grace*, 546 U.S. 1210, 126 S. Ct. 1421, 164 L. Ed. 2d 118 (2006); *Goosman* v. *State*, 764 N.W.2d 539, 544 (Iowa 2009) ("Taken together, *Fiore* and *Bunkley* stand for two propositions. First, where a court announces a new rule of substantive law that simply 'clarifies' ambiguities in existing law, federal due process requires that the decision be retroactively applied to all cases, including collateral attacks where all avenues of direct appeal have been exhausted. Second, where a court announces a 'change' in substantive law which does not clarify existing law but overrules prior authoritative precedent on the same substantive issue, federal due process does not require retroactive application of the decision."); *Nika* v. *State*, supra, 124 Nev. 1286 ("As the [United States] Supreme Court has indicated, the question of whether a particular state court interpretation of a state criminal statute constitutes a change in—rather than a clarification of—the law is a matter of state law. It is thus for this court to determine whether a decision of this court changed or merely clarified state law.").

Although a few courts have read *Fiore* and *Bunkley* to limit clarifications to only those circumstances in which the particular issue of statutory interpretation is one of first impression for the state's highest court,[7]

---

[7] The courts that concluded that a decision may be deemed clarifying only if it is the first time that the state's highest court has considered the meaning of the provision at issue appear to rely solely on the fact that the United States Supreme Court expressly noted in both *Fiore* and *Bunkley* that the issue before it had arisen under those circumstances. See, e.g., *Henry* v. *Ricks*, supra, 578 F.3d 138; *Chapman* v. *LeMaster*, supra, 302 F.3d 1197 n.4.

I agree with the courts that have concluded that the Supreme Court imposed no such limitation. See, e.g., *Clem* v. *State*, 119 Nev. 615, 625–26, 81 P.3d 521 (2003) ("[I]t is clear that under *Fiore* and *Bunkley*, a state's highest court may, by its first interpretation of a criminal statute's provisions, *either* change *or* clarify the law. It follows that where a state's highest court departs from its own previous interpretation of a statute, the new decision may also constitute either a change or a clarification of the law even though the statutory language was not changed." [Emphasis in original.]); *In re Personal Restraint of Hinton*, supra, 152 Wn. 2d 859–60 (deeming *Fiore* and *Bunkley* due process rubric to apply to case overruling prior decisions interpreting criminal statute). Indeed, it seems to me that no other approach affords the necessary deference to the primacy of state courts' interpretations of their own laws consistent with principles of comity. See *Estelle* v. *McGuire*, 502 U.S. 62, 67–68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").

Therefore, the due process question in the present case turns on whether this court characterizes *Salamon* as a clarification or a change to the law. For the following reasons, I would conclude that *Salamon* clarified the meaning of our kidnapping statutes, and, therefore, states the correct law at the time of the petitioner's

In my view, these passing references to the procedural posture of the case are a thin reed on which to rest such an important point. Indeed, one would have expected the Supreme Court to emphasize that fact as a necessary predicate to the due process question, and its failure to do so belies such a conclusion. I also am mindful that some courts have limited their own view of clarifications under state law to be only those decisions that interpret a statutory provision for the first time; see, e.g., *Kendrick* v. *District Attorney*, 591 Pa. 157, 171, 916 A.2d 529 (2007); *In re I.K.*, 220 P.3d 464, 469 (Utah 2009); but this court is free to reach a different conclusion under our law.

conviction. At the outset, I acknowledge that there is language in *Salamon* that the state reasonably points to as indicating an intent to change the law. We unequivocally "overruled" our long-standing interpretation of the kidnapping statutes to allow a conviction even when the restraint involved in the kidnapping is merely incidental to the commission of another offense perpetrated against the victim by the accused. *State* v. *Salamon*, supra, 287 Conn. 513–14, 518 n.11. Indeed, we expressly acknowledged therein that, in *State* v. *Luurtsema*, 262 Conn. 179, 811 A.2d 223 (2002), on the petitioner's direct appeal from his conviction, "we [had] rejected a claim identical in all material respects to the claim that the defendant raises in the present case . . . ." *State* v. *Salamon*, supra, 513 n.6. Reading *Salamon* with less emphasis on the particular terminology and with greater attention to the basis for the decision, however, favors characterizing it as a clarification of the law. *Salamon* rested on grounds that never had been considered by this court. Not only was it the first time that this court examined the intent element of the kidnapping statutes and the first time that we examined the circumstances surrounding the statutes' enactment, but it also was the first time that this court considered the meaning of the statute en banc. Id., 532–42. Our reexamination was prompted in part by an issue expressly left open in our prior decisions regarding whether the existing interpretation could lead to bizarre, and therefore legislatively unintended, results. Id., 533–34. Finally, we underscored that our holding did not refute completely the principles established by our prior kidnapping jurisprudence. Id., 546; see id. (reaffirming principle that "the state is not required to establish any minimum period of confinement or degree of movement"); id., 548 (affirming principle that "an accused may be charged with and convicted of more than one crime arising out of the same act or acts, as

long as all of the elements of each crime are proven"). In my view, these factors demonstrate that the court in *Salamon* intended to clarify what the kidnapping statute has meant since its inception.

I also would conclude that *Salamon* must be deemed as clarifying our kidnapping statutes for a more fundamental reason. Such a conclusion is the only one consistent with our limited role in the constitutional scheme when interpreting statutes generally and criminal statutes particularly. "When we construe a statute, we act not as plenary lawgivers but as surrogates for another policy maker, [that is] the legislature. In our role as surrogates, our only responsibility is to determine what the legislature, within constitutional limits, intended to do." (Internal quotation marks omitted.) Id., 519. "[S]ince the power to declare what conduct is subject to penal sanctions is legislative rather than judicial, it would risk judicial usurpation of the legislative function for a court to enforce a penalty whe[n] the legislature has not clearly and unequivocally prescribed it." (Internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn. 633, 675, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006); accord *Bousley* v. *United States*, 523 U.S. 614, 620–21, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998) ("[D]ecisions of this [c]ourt holding that a substantive federal criminal statute does not reach certain conduct, like decisions placing conduct beyond the power of the criminal law-making authority to proscribe . . . necessarily carry a significant risk that a defendant stands convicted of an act that the law does not make criminal. . . . For under our federal system it is only Congress, and not the courts, which can make conduct criminal." [Citations omitted; internal quotation marks omitted.]). If the statute did not criminalize the petitioner's conduct as later properly construed, it never criminalized that conduct. Simply because this court belatedly may have come to recog-

nize the meaning intended by a legislative enactment, the statute's meaning never changed. See *People v. Rodriguez*, 355 Ill. App. 3d 290, 294, 823 N.E.2d 243 (2005) ("Logically, a statute . . . can have only one meaning. . . . If the interpretation in [the later decision] is right, the interpretation in [the earlier decision] was wrong from the outset, and the trial court was wrong when it [rendered its decision]. . . . If the error was of the kind that rendered the resulting judgment void, it is, and has always been, void." [Citation omitted.]); *In re Personal Restraint of Hinton*, supra, 152 Wn. 2d 860 n.2 ("[w]hen this court construes a statute, setting out what the statute has meant since its enactment, there is no question of retroactivity; the statute must be applied as construed to conduct occurring since its enactment"); see also *United States v. McKie*, 73 F.3d 1149, 1153 (D.C. Cir. 1996) ("a decision interpreting a statute does not change the statute but rather interprets the law as enacted by the legislature"); *Buradus v. General Cement Products Co.*, 159 Pa. Super. 501, 504, 48 A.2d 883 (1946) ("[T]he construction placed upon a statute by the courts becomes a part of the act from the very beginning. And when former decisions are overruled, the reconsidered pronouncement becomes the law of the statute from the date of the enactment."), aff'd, 356 Pa. 349, 52 A.2d 205 (1947).

Indeed, although not deciding the case specifically on due process grounds, the California Supreme Court relied on the same reasoning in affording habeas relief in a case similar to the present case.[8] In *People v. Mutch*,

---

[8] The California Supreme Court's decision in *People v. Mutch*, 4 Cal. 3d 389, 482 P.2d 633, 93 Cal. Rptr. 721 (1971), predates by more than three decades the due process decisions of the United States Supreme Court in *Fiore* and *Bunkley*. Notably, however, the California court expressly disavowed reliance on retroactive application of the statute; id., 394–95; which would be the sole basis to afford habeas relief in the absence of a due process violation under *Fiore* and *Bunkley*. The California appellate courts have not considered the due process question since the United States Supreme Court issued its *Fiore* and *Bunkley* decisions.

4 Cal. 3d 389, 392–93, 482 P.2d 633, 93 Cal. Rptr. 721 (1971), the habeas petitioner was convicted under California's aggravated kidnapping statute, which made punishable the " 'kidnap[ping] or carry[ing] away' " of another person during the course of a robbery. In affirming the petitioner's conviction, the California Court of Appeals had applied the construction consistently given to the statute by the California Supreme Court in numerous cases over the preceding years. Id. Under that construction, the statute applied to any movement of the victim, no matter how slight the distance, in the course of a robbery. Id., 393. Despite this settled precedent, after the petitioner's conviction became final, the California Supreme Court reexamined the question of the legislature's intent with respect to whether the statute applied to incidental movements and reached a contrary conclusion.[9] *People* v. *Daniels*, 71 Cal. 2d 1119, 1126–39, 459 P.2d 225, 80 Cal. Rptr. 897 (1969). Thereafter, in *Mutch*, the court considered whether the petitioner was entitled to habeas relief in light of *Daniels*. The court noted: "[T]he purpose of our decision in *Daniels* was not to 'redefine' the crime of kidnap[p]ing to commit robbery—under our tripartite system of government, that power is vested exclusively in the legislative branch—but simply to declare what the intent of the [l]egislature has been in this regard since the [statute's] enactment . . . . In *Daniels* we did not overturn a judge-made rule of common law;

---

[9] Like this court did in *Salamon*, the court in *People* v. *Daniels*, 71 Cal. 2d 1119, 1127–28, 459 P.2d 225, 80 Cal. Rptr. 897 (1969), declined to view the legislature's inaction following the court's earlier decisions as a legislative endorsement of the court's construction. The court relied on case law construing closely related statutory language; id., 1128–30; which, unlike the court's earlier cases interpreting the aggravated kidnapping statute, had considered the rule of statutory construction that "[g]eneral terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence." (Internal quotation marks omitted.) Id., 1130. The court also considered authority from other jurisdictions favoring a different interpretation. Id., 1134–39.

rather, we recognized a statutory rule which the [l]egislature adopted in 1951 but to which courts had not previously given appropriate effect. . . . .

"Here, as in *Daniels*, the issue is 'whether the acts of [the defendant], on the record in this case, constitute the kind of conduct proscribed by [the kidnapping statute].' From the foregoing analysis we conclude that a robber who suffered a . . . conviction of violating [the kidnapping statute] because he compelled his victim to perform movements which were 'merely incidental to the commission of the robbery and [did] not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself,' was convicted under a statute which did not prohibit his acts at the time he committed them. As the Court of Appeal correctly reasoned in a decision rendered shortly after *Daniels*, 'There, the Supreme Court stresses that its interpretation of [the kidnapping statute] is what the [l]egislature always intended that it should be. In this light, *what [the] defendant did was never proscribed under [the statute].*' " (Citations omitted; emphasis in original.) *People* v. *Mutch*, supra, 4 Cal. 3d 394–96, citing *People* v. *Ballard*, 1 Cal. App. 3d 602, 605, 81 Cal. Rptr. 742 (1969). Accordingly, the California Supreme Court determined that the defendant was entitled to seek habeas relief and that, in light of the record establishing that the brief movements that he had compelled his victims to perform in furtherance of the robbery were merely incidental to that crime and did not substantially increase the risk of harm otherwise present, his conviction had to be reversed. *People* v. *Mutch*, supra, 397–99.

For all of the aforementioned reasons, I would conclude that *Salamon* clarified the law, and, as such, it stated the correct interpretation of the kidnapping statute at the time of the petitioner's conviction. Accordingly, I would conclude that the petitioner in the present

case is entitled to challenge his conviction on due process grounds.

## II

Although this conclusion properly would dispose of the case before us, because the plurality has rested its judgment on the retroactivity question, I turn to that issue. I wholly agree with the plurality's thoughtful explanation as to why we should reject the state's call to adopt a per se rule against retroactivity and its equally persuasive rejection of the state's arguments against affording relief to the petitioner in the present case. For the reasons cited in part I of this concurring opinion, however, I would adopt, consistent with the overwhelming majority of courts to consider this issue, a per se rule that a decision of this court interpreting more narrowly the scope of conduct deemed criminal under a statute must apply retroactively to the date of the statute's enactment. I take issue with the fact that the plurality deems the better course to craft a novel rule to guard against certain fringe cases, as it concedes that those cases that cannot benefit from its rule of retroactivity would be "few and far between." As a general matter, I note that it has not been this court's past practice to craft rules to accommodate cases on the margins, and with good reason. I have, however, more specific concerns about the rule as stated.

I begin by noting that the mere fact that the plurality has adopted a novel approach to the question of retroactivity, in that it differs from both the per se retroactive rule adopted by the federal courts and most state courts and the balancing test adopted by a handful of other jurisdictions,[10] may be cause to scrutinize it carefully

[10] The plurality accurately recites the positions of these jurisdictions on this question, and, therefore, there is no need to recite those cases here. Tallying the numbers reflects that: the federal courts and twelve state courts have adopted a per se rule in favor of retroactivity; a thirteenth state court has signaled that it intends to do the same; and a fourteenth state court has wavered on this question. Therefore, it appears that there are only three

but is not a reason, in and of itself, to reject that approach. Rather, my concerns are with the standard itself and, more importantly, the lack of a persuasive justification for adopting such an approach.

The plurality determines that retroactivity will not apply to cases in which to decline to do so would be "neither arbitrary nor unjust." It elaborates that such circumstances are those in which "it is clear that the legislature did intend to criminalize the conduct at issue, if perhaps not under the precise label . . . ." It notes that, "[i]n situations where the criminal justice system has relied on a prior interpretation of the law so that providing retroactive relief would give the petitioner an undeserved windfall, the traditional rationales underlying the writ of habeas corpus may not favor full retroactivity." As examples of such extraordinary cases, the plurality cites a line of cases from New York and an Indiana Court of Appeals case.[11]

---

jurisdictions (Florida, New York and New Jersey) that clearly adhere to a balancing test.

[11] I would point out that, although the plurality accurately quotes from these cases, which essentially state the point that it is fair not to afford relief when the evidence demonstrates that the petitioner could have been convicted of some other crime, it fails to make clear that this concern was neither the sole or dispositive one in these cases. Rather, the courts made this comment in connection with their application of a balancing test. See *Powell* v. *State*, 574 N.E.2d 331, 334 (Ind. App. 1991); *Policano* v. *Herbert*, 7 N.Y.3d 588, 603–604, 859 N.E.2d 484, 825 N.Y.S.2d 678 (2006). Moreover, because Indiana has abandoned the balancing test in favor of a per se rule of retroactivity; see *Jacobs* v. *State*, 835 N.E.2d 485, 488–91 (Ind. 2005); there is no basis on which to conclude that such a consideration currently would have any bearing in that jurisdiction.

The plurality cites a third case in footnote 20 of its opinion, *Kleve* v. *Hill*, 185 F.3d 1009, 1014 (9th Cir. 1999), but that case provides no support for the rule that the plurality adopts. In *Kleve*, the court concluded that the jury *actually* had found each of the elements satisfied for conspiracy to commit murder in the first degree, despite having returned a verdict of guilty only on conspiracy to commit murder in the second degree and therefore a California case deeming the latter crime not to exist did not provide a basis on which to afford relief to the petitioner. Id., 1011–14.

My first concern is that this standard is unclear, begging the following questions:

Would it apply only when either the petitioner's claim involves a concession that he committed some other crime for which he was not convicted or when the jury's findings actually support a conviction for another crime? Or also when the evidence presented to the jury *could* have supported a conviction for another crime?

Would it apply when the conduct at issue in the challenged conviction could satisfy the elements of any other criminal offense? Only an offense carrying the same potential penalty? Only an offense of comparable moral culpability?

Does the limitation apply only when the conviction involved an act of violence or one causing serious physical injury or death?

Would it apply only when vacating the conviction would preclude retrial?

Is it a matter left wholly to the discretion of the habeas court as to whether to apply our decision retroactively? Or is retroactivity barred if the circumstances meet the majority's criteria?

More fundamentally, I am not persuaded that, under Connecticut law, there would be much risk of the concern cited by the plurality that, without its exception to retroactivity, defendants otherwise may go unpunished for criminal conduct. Connecticut requires "the jury to deliberate thoroughly, and to consider and dispose of a greater offense before it deliberates on the lesser included offense . . . ." *State* v. *Salgado*, 257 Conn. 394, 405, 778 A.2d 24 (2001). Under well established principles, if a court reverses judgment on the greater offense, it may direct judgment to be entered on a lesser included offense. See *Carpenter* v. *Commissioner of Correction*, 290 Conn. 107, 120, 961 A.2d 403 (2009) ("In

*State* v. *Grant*, 177 Conn. 140, 147, 411 A.2d 917 [1979], this court first adopted the rule that it may order the modification of an erroneous judgment where the evidence is insufficient to support an element of the offense stated in the verdict but where the evidence presented is sufficient to sustain a conviction for a lesser included offense. Although the court recognized that [t]his power should be exercised only when it is clear that no undue prejudice will result to the accused . . . it determined that no such prejudice occurs if [t]he defendant has had a fair adjudication of guilt on all the elements of the crime . . . . A defendant is deemed to have such a fair adjudication when the crime is a lesser included offense of the crime charged, and, under the circumstances of the case, the jury could have explicitly returned [a verdict of guilty on the lesser included offense and] the defendant was aware of his potential liability for this crime." [Citations omitted; internal quotation marks omitted.]).

Indeed, this court has adopted a broad view of lesser included offenses in the context of homicides, such that, as a matter of law, manslaughter in the first degree (a crime requiring a reckless state of mind) is a lesser included offense of murder (a crime requiring an intentional state of mind). Id. Under such circumstances, this court has reversed a conviction for murder and directed a judgment on reckless manslaughter in the first degree. See id., 127. Therefore, the situation at issue in the New York cases cited by the plurality— wherein retroactive application would have vacated a conviction for depraved indifference murder and the defendant could not be convicted of intentional murder—would not arise in Connecticut courts.[12] In sum, unless the lesser included offenses are similarly

[12] A death resulting from reckless indifference is punishable only as manslaughter, not murder, under Connecticut law. See General Statutes §§ 53a-55, 53a-55a and 53a-56.

affected by the court's narrowing construction of the criminal statute, there should be no bar to obtaining a conviction on a lesser included offense.

Moreover, unlike the New York double jeopardy principles that precluded retrial on the other comparably serious charge that could have been supported by the evidence had the jury reached it; see *Policano* v. *Herbert*, 453 F.3d 79, 80–81 (2d Cir. 2006) (Raggi, J., dissenting from denial of rehearing en banc); there is no comparable double jeopardy bar under the federal or Connecticut constitutions.[13] See generally *State* v. *Hedge*, 297 Conn. 621, 665–66, 1 A.3d 1051 (2010); *State* v. *Colon*, 272 Conn. 106, 293–94, 297 n.108, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005). Indeed, in light of the routine practice of the prosecutors in this state of charging any serious offense that the evidence would support, it seems highly unlikely that a defendant who has obtained relief from a conviction that his conduct did not support would escape conviction of all charges commensurate with his criminal conduct if we were to apply a per se rule of retroactivity. In addition, double jeopardy would not bar prosecution of a charge that satisfies the test enunciated in *Blockburger* v. *United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932). See *State* v. *Alvarez*, 257 Conn. 782, 789, 778 A.2d 938 (2001) (*Blockburger*, which provides sole test for deciding whether two offenses constitute same offense for double jeopardy purposes, assesses whether each offense requires proof of fact that other does not). In light of these facts and the plurality's persuasive rejection of the state's arguments regarding the burdens

---

[13] Of course, double jeopardy would bar retrial on any offense on which the jury acquitted the defendant. *State* v. *Hedge*, 297 Conn. 621, 665, 1 A.3d 1051 (2010).

attendant to retrial, I see no justification for crafting a limited exception to a rule favoring retroactivity.[14]

Even if a rare case were to exist in which a defendant could not be prosecuted for a comparable offense, I find it incongruous to craft an exception to retroactivity predicated on the view that the legislature did intend to penalize the conduct at issue, but under a different label than the one charged. The entire basis for considering retroactivity is that the legislature never intended for the charge on which the conviction was based to reach the defendant's conduct. With respect to the question of whether the defendant's conduct violated some other statute for which he was not convicted, the legislature does not make that individualized assessment, a jury does. Thus, a related concern is that allowing the habeas court to decline to afford relief in light of its finding that a jury *could have* convicted the defendant of another offense is in some tension with a fundamental constitutional principle. A criminal defendant has a constitutionally protected right to jury findings on every element of the crime. See *Sullivan* v. *Louisiana*, 508 U.S. 275, 277, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993) (noting that sixth amendment right to trial by jury in serious criminal cases "includes, of course, as its most important element, the right to have the jury, rather

[14] Indeed, I would point out that the egregious result that the plurality so assiduously seeks to avoid, if in fact such a result could occur under Connecticut law, would ensue for any comparable case in which the defendant had not yet exhausted his appeals by the time this court issued its clarifying decision. See *State* v. *Hampton*, 293 Conn. 435, 462 n.16, 978 A.2d 1089 (2009) ("[a]lthough *Salamon* was not decided until July 1, 2008, nearly two years after the trial in the present case, it is still applicable to our consideration of the defendant's appeal because of the general rule that judgments that are not by their terms limited to prospective application are presumed to apply retroactively . . . to cases that are pending" [internal quotation marks omitted]); *State* v. *DeJesus*, 288 Conn. 418, 429 n.9, 953 A.2d 45 (2008) (applying *Salamon* under similar circumstance); *State* v. *Thompson*, 118 Conn. App. 140, 154, 983 A.2d 20 (2009) (same), cert. denied, 294 Conn. 932, 986 A.2d 1057 (2010).

than the judge, reach the requisite finding of 'guilty' ");
*State* v. *Hines*, 187 Conn. 199, 210, 445 A.2d 314 (1982)
("[i]t must always be borne in mind that litigants have
a constitutional right to have issues of fact decided by
the jury and not by the court" [internal quotation marks
omitted]). Although, technically, allowing the habeas
court to make such a determination does not violate
this constitutional right because the defendant would
remain convicted under the offense for which the jury
did render a verdict, such an approach would seem
to violate the spirit of this principle. If the defendant
properly could be convicted of another crime, I would
leave that determination to a jury.

Therefore, I concur in the judgment.

PALMER, J., concurring. I agree with much of the
plurality opinion and concur in the result that the plural-
ity reaches. I am unable to join the plurality opinion,
however, because I do not believe that we should decide
the question of whether to adopt a per se rule in favor
of full retroactivity under our common law. The plural-
ity may be correct that there is persuasive reason to
reject a per se rule, but we need not resolve the issue
to decide the present case because, as the plurality also
concludes, the petitioner, Peter Luurtsema, is entitled
to full retroactivity regardless of whether we adopt such
a rule. My primary reason for concluding that we should
decline to decide the petitioner's claim seeking a per
se rule concerns another claim that this court is not
deciding, that is, the petitioner's constitutional due pro-
cess claim. Although I also agree with the plurality that
we need not and should not decide the constitutional
claim, the plurality, in declining to address that claim,
leaves open the possibility that principles of due pro-
cess require full retroactivity in all cases. Indeed, that
is what Justice Katz concludes in her concurrence. If
Justice Katz is correct that due process requires full

retroactivity in all cases, then this court, in rejecting a per se rule for purposes of our common law, adopts a rule that is contrary to constitutional requirements, a result that should be avoided. I express no view as to whether Justice Katz is correct in her constitutional analysis, but I see no good reason to adopt a common-law rule—unnecessarily for purposes of the present case—that may conflict with constitutional principles.[1] Of course, sometimes it is useful to the bench and bar for this court to clarify an area of the law by considering and deciding an issue that, strictly speaking, is unnecessary to resolve the case. In my view, however, this case is not such a case, as it is exceedingly rare for a court to be confronted with a claim like the claim that the petitioner raises. I therefore concur.

McLACHLAN, J., concurring. I concur with the plurality reluctantly. I concur reluctantly because the majority opinion in *State* v. *Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008), compels me to concur. Although I agree with the holding of *Salamon*, namely, that "to commit a kidnapping in conjunction with another crime, a defendant must intend to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit the other crime";

---

[1] The plurality notes that, under United States Supreme Court precedent, "[when] a state court changes its interpretation of a statute, the construction does *not* require retroactivity." (Emphasis in original.) Footnote 21 of the plurality opinion. The plurality further explains that its "common-law analysis assumes, arguendo, that *Salamon* did represent a change, rather than [a] clarification, of the law." Id. I agree with both of these statements, but neither statement mitigates the concern that I have expressed regarding the potential that the plurality's holding ultimately may be deemed to violate principles of due process. This is so because the plurality's decision to reject a per se rule of full retroactivity indeed may violate principles of due process if this court were to determine—as Justice Katz contends—that *Salamon* represented a clarification of the law rather than a change in the law, a determination that the plurality does not make for purposes of the present case.

id., 542; I disagree with that portion of the analysis in which the court concluded that for more than thirty years, and in innumerable cases, the courts of this state, including this court, have misconstrued our kidnapping statutes. The discussion of legislative acquiescence in the dissent in *State* v. *Salamon*, supra, 595–601, convinces me that the courts of the state, including this court, had not misconstrued General Statutes § 53a-91 et seq. for a period of more than thirty years. Thus, when the petitioner in the present case, Peter Luurtsema, was convicted of kidnapping in 2000, it was in accordance with the laws of this state, which had been consistently interpreted at that time for more than twenty years.

In *Salamon*, this court adopted a "new rule" expressly overruling the law in existence at the time of the petitioner's crime and conviction. Id., 542. As reasoned by the Wisconsin Supreme Court, "[t]o pretend that [past precedent] never existed or applied to any case simply to reach a desired result is disingenuous to the litigants, attorneys and . . . courts that were bound by those decisions." *State* v. *Lagundoye*, 268 Wis. 2d 77, 100, 674 N.W.2d 526 (2004). To date the United States Supreme Court has not required "new" interpretations of statutes to be applied retroactively in criminal cases, and I would not so provide. See *Fiore* v. *White*, 531 U.S. 225, 121 S. Ct. 712, 148 L. Ed. 2d 629 (2001). Although I would prefer to follow our long-standing principle of finality of judgments and would deny the petitioner the relief that he seeks, I am compelled to follow the precedent established by *Salamon*, and, accordingly, concur in the result.